Sheena **HODGES**, by her father and next friend, Willie **HODGES**, and Nikishia Hunter, by her mother and next friend Daucenia Hunter, each, solely on their own individual behalf; and, Dede, Teteh and Kwame Atiogbe, by their father and next friend Gotlieb Atiogbe, Jaime and Edgardo Duran, by their mother and next friend Elena Duran, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**PUBLIC BUILDING COMMISSION OF CHICAGO, Chicago Board of Education, and the City of Chicago, Defendants.**

No. 93 C 4329.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 14, 1994.

Patricia Mendoza, City of Chicago Bd. of Educ., Harvey Michael Grossman, Rocio deLourdes Cordoba, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Amari Mitchell, Ninette Boonstra, Carrie Boonstra, Jeremy Bartel.

Patricia Mendoza, City of Chicago Bd. of Educ., Colleen K. Connell, Harvey Michael Grossman, Rocio deLourdes Cordoba, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Nikishia Hunter, Dede Atiogbe, Teteh Atiogbe, Kwame Atiogbe, Jaime Duran, Sheena Hodges, Edgardo Duran.

Javier H. Rubinstein, James D. Holzhauer, Timothy Simon Bishop, Mayer, Brown & Platt, Richard Freund Friedman, Earl L.

Neal, Langdon David Neal, Earl L. Neal & Associates, Chicago, IL, for Public Bldg. Com'n of Chicago.

Iris Ellen Sholder, Pamela Elana Cash, Miguel Angel Rodriguez, Michael Joseph Hernandez, City of Chicago Bd. of Educ., Chicago, IL, for Chicago Bd. of Educ.

Susan S. Sher, Susan R. Lichtenstein, Laure Ann Mullaney, Andrew S. Mine, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for City of Chicago.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This suit centers around the proposed expansion of the Chicago High School for Agricultural Sciences ("CHSAS"). Plaintiffs are present and future African–American and Hispanic students and applicants of the CHSAS and their parents. They claim that the Public Building Commission of Chicago ("PBC"), the Chicago Board of Education ("CBOE"), and the City of Chicago ("City") blocked the construction of a much needed expansion of the CHSAS, and then scaled back the plans for expansion. This conduct, according to plaintiffs, constitutes intentional racial discrimination and breach of contract. The City and the PBC have moved to dismiss.[1] For the reasons set forth below, the motions are granted in part and denied in part.

### FACTS [2]

The CHSAS is a Chicago magnet high school located in Mount Greenwood, Illinois. The school is situated adjacent to seventy-two acres of land and offers students a unique opportunity to study agriculture-related sciences in addition to the regular curriculum. The CHSAS is one of the success stories of Chicago's public school system. The school prepares its students for careers in diverse fields including agribusiness, commodities exchange, food sciences, horticulture, veterinary sciences, and federal food quality inspection. CHSAS students consistently have excelled academically. Approximately seventy percent of its students attend college and many of these students receive academic scholarships.

At present, the CHSAS is vastly overcrowded. In a space originally designed to hold 300 elementary students, the school presently serves 450 high school students. Each year, the school rejects several hundred applicants because of space constraints. For example, during the 1993–1994 school year, 912 students applied to the CHSAS for 110 openings in the freshman class. Ninety percent of the applicants were minorities.

The CHSAS has a diverse racial make-up. Seventy percent of the student body are African–American, fifteen percent are Hispanic, and fifteen percent are white. By contrast, the surrounding Mount Greenwood community is 98% white.

In 1984, the CBOE's staff began consulting with educational experts to determine the scope of the necessary expansion. The CBOE ultimately determined that facilities and enrollment of up to 1200 students would be educationally and economically appropriate.

In May 1990, the CBOE and the PBC entered into a contract whereby the PBC would sell bonds and construct an expanded facility for the CHSAS and the CBOE would lease the facility and levy a tax to pay the rent. When the CBOE made its last rent payment, the PBC would transfer title to the CBOE. The PBC agreed to build the expansion in conformity with the CBOE's Educational Specifications which provide that "the qualities of adaptability, flexibility and expansibility should be given strong consideration in planning the new facility," and the design "should attempt to make provision for appropriate structural, mechanical, electrical and architectural features which will allow for modifications to provide for an additional

---

1. The CBOE has filed an answer to the second amended complaint and a cross-complaint against the PBC for breach of its lease with the CBOE and breach of a consent decree to which the CBOE is a party. The PBC has answered the cross-complaint.

2. For purposes of a motion to dismiss, the facts alleged in the complaint are assumed to be true. *Leatherman v. Tarrant County Narcotics Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993).

25% increase in student capacity at some time in the future."

The PBC spent the next two years and $800,000 of the bond proceeds developing a set of detailed architectural and engineering plans. The plans provided for an immediate increase in enrollment to 600 students and sufficient space to accommodate another expansion of up to 1200 students. The CBOE approved these plans, and in July, 1991, the PBC filed an application for approval of the plans with the Chairman of the Committee on Zoning of the Chicago City Council. However, the PBC delayed moving forward with the application process for two years while it sought to win the support of the Mount Greenwood alderman, Virginia Rugai, without which the zoning committee would not approve a zoning application.

Alderman Rugai initially opposed the application because of issues raised by her constituency. Her constituents formally voiced concerns about (1) whether the funds for the expansion could be used on other areas if the expansion did not proceed; (2) whether enrollment would be capped at 600 students; (3) whether the plans could be designed so as to ensure that no more than 600 students could attend; (4) whether the community would be permitted to use the school's recreational facilities and classrooms; (5) whether the land would be farmed or used for livestock purposes; (6) whether a fence could be erected separating the school's property from private residential property; (7) whether measures could be taken to ease traffic around the school; and (8) whether students would be allowed to use Mount Greenwood Park. Although these concerns are not couched in racial terms, plaintiffs claim that racial animus is a significant factor in the community opposition to the CHSAS expansion. The expansion will result in an increased number of African–American and Hispanic students attending the CHSAS and, consequently, coming into the Mount Greenwood community.

As part of the effort to get the application approved, the PBC revised the design plans. The revised design was several thousand square feet smaller, placed a 600–student cap on enrollment, provided for mandatory local student recruitment, instituted a land use plan, and prohibited future construction on a portion of the CHSAS property. The revised design won Alderman Rugai's support, and on December 17, 1993, the PBC submitted a revised application to the zoning committee. Alderman Rugai spoke in favor of the revised plan before the zoning committee, and the application was approved. Shortly after, the Chicago City Council approved the zoning amendment embodying the revised zoning application.

Plaintiffs argue that defendants' failure promptly to construct the CHSAS expansion pursuant to the original plans has an intentionally discriminatory impact on African–American and Hispanic members of the CHSAS student body and applicant pool. According to plaintiffs, the local recruitment and enrollment dictate was intended to and will dilute minority enrollment. Further, the enrollment cap and the barriers to future expansion will deny eligible minority applicants, who otherwise would be admitted to the CHSAS, an opportunity to obtain an education in agricultural sciences. As a further consequence of the enrollment cap, local recruitment, and the limits on future expansion, minority applicants will have no choice but to enroll in racially isolated high schools—a result which directly contravenes the CBOE's efforts to reduce the racial isolation of minority students through magnet schools. Therefore, plaintiffs claim they have been denied equal and adequate educational facilities and benefits, and have suffered a diminished quality and level of educational services in violation of the Equal Protection Clause of the Fourteenth Amendment (Count I), Title VI and its accompanying regulations (Counts II and III), the consent decree and desegregation plan entered in *United States v. Board of Education,* No. 80 C 5124 (N.D.Ill.) ("Consent Decree") (Count IV), and the lease agreement between the PBC and the CBOE ("Lease") (Count V). They seek declaratory and injunctive relief, damages, attorneys' fees and costs.

The PBC and the City have moved to dismiss the complaint. The PBC argues that plaintiffs fail to state a claim under Title VI because they cannot allege that the PBC or

the CHSAS project receive federal funding. The City concedes that it receives federal funding, but argues that plaintiffs' claims still fail because they did not and cannot allege that they are the intended beneficiaries of any federal financial assistance received by the City relating to the CHSAS. Both defendants further argue that all of plaintiffs' claims are fatally defective because they fail to allege any facts sufficient to establish either of the necessary elements of an equal protection claim: that the defendants' alleged actions had a discriminatory effect, or that they were motivated by a discriminatory intent. With respect to plaintiffs' claim for violation of the Consent Decree, defendants argue that no such violation has occurred and, in any event, plaintiffs lack standing to enforce the Decree. Finally, the PBC argues that plaintiffs lack standing to assert a claim for violation of the Lease.

## ANALYSIS

### Motion to Dismiss Standard

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assoc., Inc. v. Chicago Housing Authority*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). When considering a motion to dismiss, this court must accept all well-pleaded facts as true, draw all inferences in favor of the plaintiffs, and view plaintiffs' allegations in the light most favorable to them. *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). This court will grant a motion to dismiss only if it appears beyond doubt that plaintiffs can prove no set of facts entitling them to relief. *Venture Assocs. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 432 (7th Cir.1993); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### Count I: Equal Protection

■ As an initial matter, plaintiffs argue that the amendment to the ordinance is not race-neutral. Although the amendment itself does not contain any race-specific language, plaintiffs contend that the terms of the amendment conceal a covert racial classification. Under *Personnel Administrator v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979), such a classification is "presumptively invalid," regardless of purported motivation, and can be upheld only upon an extraordinary justification.

■ In rare instances, courts have held that a classification that does not mention race constitutes racial discrimination "on its face" because the law (though neutral in its language) cannot be explained except in terms of race. As examples, plaintiffs cite *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir.1992) and *Asian American Business Group v. City of Pomona*, 716 F.Supp. 1328, 1332 (C.D.Cal.1989). In *Bishop*, the court found that the use of residence to strike only African–American jurors, although facially neutral, operated as a pretext for race discrimination in jury selection and thus was an unconstitutional racial classification. Likewise, in *Asian American Business Group*, the court found that an ordinance which imposed restrictions only on signs using foreign alphabetical characters constituted overt discrimination on the basis of national origin.

■ The court has examined the zoning amendment and finds that it does not harbor any covert racial classification. Unlike in *Bishop* and *Asian American Business Group*, where the discriminatory action burdened minorities with a symmetry too perfect to be mere coincidence, the zoning amendment here arguably burdens both minorities and non-minorities. The local recruitment and enrollment requirement, the cap imposed on student population, future expandability, and the use of the CHSAS property may, as plaintiffs allege, burden minority interests, but not to the universal exclusion of non-minority interests. Moreover, whereas in the cases cited by plaintiffs the defendants' actions could not be explained except in terms of race, the same cannot be said of defendants' actions here. Thus, there is no "obvious pretext for racial discrimination" at work, *Feeney*, 442 U.S. at 272, 99 S.Ct. at 2292, and plaintiffs cannot

take advantage of the presumption of invalidity which applies to such cases.

Further, plaintiffs' reliance on *Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) is misplaced. In *Seattle School Dist.,* the Court struck down a voter initiative directed solely at interfering with desegregative busing. Despite its facial neutrality, the Court had no trouble finding that the initiative was a covert racial classification:

> [T]he text of the initiative was carefully tailored to interfere only with desegregative busing. Proponents of the initiative candidly "represented that there would be no loss of school district flexibility other than in busing for desegregation purposes." And, as we have noted, Initiative 350 in fact allows school districts to bus their students "for most, if not all," of the nonintegrative purposes required by their educational policies.

*Id.* at 471, 102 S.Ct. at 3195 (footnote and cites omitted). Therefore, the Court concluded that the initiative was presumptively invalid and, because the State had not proffered any extraordinary justification for its creation, unconstitutional. *Id.* at 485, 102 S.Ct. at 3202.

In contrast, the instant case does not involve an inherently racial issue such as desegregative busing. Rather, the expansion of a public school is an issue which may or may not have a racial nature depending on the existence of discriminatory impact and intent. Therefore, this is not the type of issue which can give rise to a presumption of invalidity, and plaintiffs must adequately plead discriminatory impact and intent in order to withstand defendants' motions to dismiss.

### A. *Disparate Impact*

■ Defendants argue that plaintiffs have failed to plead disparate impact because they cannot allege that minorities are adversely affected by the amendment to the ordinance in a way that is different from the way non-minorities are affected. According to defendants, all the students—minority and non-minority—are affected in precisely the same way, and therefore no disparate impact exists.

Plaintiffs deny that minority and non-minority students are affected in the same way. Rather, plaintiffs claim that minorities are disparately (and differently) impacted by the revised design because, unlike non-minority students, they are struggling to escape the racial isolation in their neighborhood schools. Therefore, any reduction in the number of students who can attend the CHSAS creates a greater hardship on minorities who, if rejected, must return to racially isolated schools, than on non-minorities for whom rejection has much less devastating consequences.

The court is well-aware that minority students often face unique challenges and obstacles to attaining equal public educational opportunities. It may in fact be true that minority students apply to the CHSAS in order to escape the racial isolation they experience at their own neighborhood schools. However, the chain of causation from racial isolation at one's local school to application and rejection at the CHSAS to disparate impact is a tenuous one, and plaintiffs have not alleged sufficient facts to fully substantiate it.

■ Nonetheless, disparate impact need not consist solely of an impact which affects minorities and non-minorities differently. Plaintiffs are entitled to base their disparate impact claim on statistics which establish that minorities are primarily affected by (and, ultimately, are the target of) a governmental action. *See, e.g., Hunter v. Underwood,* 471 U.S. 222, 227, 105 S.Ct. 1916, 1919, 85 L.Ed.2d 222 (1985) (disparate impact established by statistics which showed that "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer" under statute providing for disenfranchisement of persons convicted of any crime involving moral turpitude). Indeed, the primary thrust of plaintiffs' disparate impact allegations is that, based on sheer numbers, minorities have shouldered the burden of the adverse conditions at the CHSAS and will continue disproportionately to shoulder the burden under the revised design. Specifically, plaintiffs allege that minorities comprise

85% of the CHSAS student body and approximately 90% of the applicant pool. Therefore, according to plaintiffs, minorities have borne and will continue to bear the brunt of prolonged overcrowding and lack of program space caused by the revised limited expansion plan because the vast majority of students turned away or forced to learn in an inadequate space undoubtedly will be minorities.

 Defendants admit that implementing the revised design will impact more African-American and Hispanic students than white students but argue that this fact, in and of itself, is of no moment. Rather, they appear to suggest that the fact that the non-minority 15% of the CHSAS student body and 10% of the CHSAS applicant pool also are adversely affected by the revised design forecloses the existence of a disparate impact. This argument is tantamount to saying that as long as a measure affects some non-minorities as well as minorities it will be immune from constitutional challenge. Courts do not subscribe to this view of equal protection. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1291 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) ("fact that the conduct complained of adversely affected white as well as nonwhite people ... is not by itself an obstacle to relief under the Fair Housing Act"). The undisputed fact that 85% percent of the CHSAS students and 90% of the CHSAS applicants are minorities, together with the other well-plead allegations of plaintiffs' complaint, is enough to sustain their allegations of disparate impact.

Defendants predict that today's decision will have dire consequences for equal protection jurisprudence. In their opinion, the result will be that *"every action or inaction of any sort* relating to the public schools would automatically have a racially discriminatory effect merely by reason of the predominance of minorities in the system—and, by analogy, that every single decision of the Chicago Housing Authority, and every decision of the City or the State relating to any racially-imbalanced neighborhood (and thus every decision relating to the City of Chicago as a whole) would have a disparate racial effect for purposes of the Equal Protection Clause." PBC Mem. in Supp. of Mot. to Dismiss Sec. Am. Compl. at 13 (emphasis in original).

 These assertions are overly simplistic. The court has no fear that today's holding will open the floodgates to equal protection litigation. An Equal Protection Clause claim is not comprised solely (or even predominantly) by a disparate effect. The touchstone of a claim, and hence the more stringent requirement, is discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (official act is not unconstitutional solely because it has a racially disproportionate impact); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) (same). Therefore, although the court today holds that a claim of disparate impact may be based on statistics which show that minorities primarily comprise the class of people negatively impacted by a facially neutral measure, these statistics alone are not determinative of discriminatory intent.

### B. *Discriminatory Intent*

 In order for plaintiffs to demonstrate a prima facie case of racial discrimination under the Equal Protection Clause, they must establish not only that they are treated differently under the zoning ordinance, but that the defendants acted with discriminatory intent. *Sims v. Mulcahy,* 902 F.2d 524, 539 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). The requirement of a demonstration of intent based on membership in a particular class is more than a decision maker's simple awareness of the consequences of his or her actions. As the Supreme Court stated in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979): "'Discriminatory purpose,' ... implies more than intent as volition or intent as awareness of the consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (citation and footnotes omitted).

Defendants argue that plaintiffs' complaint fails because they have alleged few or no facts to substantiate the allegation that the Mount Greenwood community opposition to the CHSAS expansion was racially based or that defendants knew the opposition was racially based. Defendants' arguments are premature. On a motion to dismiss a claim under the Equal Protection Clause, "we require no more from plaintiffs' allegations of intent than what would satisfy Rule 8's notice pleading minimum and Rule 9(b)'s requirement that motive and intent be pleaded generally." *Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 497 (7th Cir.1993). In the present case, plaintiffs have alleged "discriminatory intent" in the following paragraphs:

> Defendant PBC knew that the Alderman's refusal to approve the application was in response to and acquiesced in the Mount Greenwood community opposition, which said defendant knew to be motivated, in significant part, by racial animus. Sec. Am. Compl. ¶ 65.

> [W]hile the Ad Hoc Committee's concerns were not stated in racial terms, racial animus is a significant factor in the community opposition to CHSAS expansion of facilities and increase in enrollment. This community opposition objects to the expansion, in significant part, because it will result in an increased number of African–American and Hispanic students attending CHSAS and consequently, coming into the Mount Greenwood community. *Id.* ¶ 70.

> In maintaining her opposition to the expansion of CHSAS facilities in conformity with the original plans and increased enrollment at the school, the Alderman has been responding to and acquiescing in community opposition which she knows to be motivated, in significant part, by racial animus. *Id.* ¶ 72.

> In incorporating the revised design and said provisions, the PBC adopted the position of the Ad Hoc Committee and the Alderman in order to gain the approval of the Alderman. In agreeing to said position, the PBC acted in response to and acquiesced in the Mount Greenwood community opposition, which said defendant knew to be motivated, in significant part, by racial animus. *Id.* ¶ 74.

> In order to ensure the objecting Mount Greenwood residents that the CHSAS student enrollment would remain at 600, the PBC included an express provision in the revised zoning application that specifically limits the school to 600 students. *Id.* ¶ 83.

> The revised application imposes a land use plan which explicitly preserves a large portion of the CHSAS property for farming. *Id.* ¶ 84.

> The PBC included in the revised application, a requirement that the CBOE develop and implement a program to affirmatively recruit residents of the surrounding community neighboring CHSAS for enrollment as students to the maximum extent permissible under the provision for the Comprehensive Student Assignment Plan and the Student Desegregation Plan for the Chicago Public Schools. *Id.* ¶ 86.

> The intent and effect of this restriction is to maximize the number of non-minority students (the surrounding community is 98% white) and to minimize the number of minority students at CHSAS. *Id.* ¶ 88.

> Because the zoning amendment adopts and requires compliance with the revised design and the other complained of provisions, said amendment responds to and acquiesces in Mount Greenwood community opposition which the PBC, City and Alderman know to be motivated, in significant part, by racial animus. *Id.* ¶ 93.

By alleging that the City and the PBC "knew" that the community's opposition was racially motivated and that the defendants amended the expansion plan "in response to" that opposition, plaintiffs have satisfied the minimum standards for pleading intent. Further, the allegation that defendants amended the plan "in response to" community opposition is the same as saying that the defendants amended the plan " 'because of,' and not merely 'in spite of,' " any adverse effects upon minority school children. At this stage in the litigation, plaintiffs have done all that is required to state a claim under the Equal Protection Clause.

■ Defendants note that plaintiffs have not attributed any racial animus to either the City or the PBC independent of the racial animus held by the community. However, defendants themselves need not have their own racial animus. It is sufficient that the City and the PBC knowingly effectuated the racial animus held by the community, thereby adopting it. In *United States v. Yonkers Board of Education*, 837 F.2d 1181, 1223–26 (2d Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), the City of Yonkers argued that it was entitled to judgment in its favor on plaintiffs' housing discrimination claim because its housing decisions merely responded to the concerns of its citizens who opposed desegregation. The court rejected this argument: "[A] governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens." *Id.* at 1224. This view is not unique to the Second Circuit. *See Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir.1970); *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 144 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Hoots v. Pennsylvania*, 672 F.2d 1107, 1115 (3d Cir.), *cert. denied*, 459 U.S. 824, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1063–66 (4th Cir.1982); *United States v. City of Birmingham*, 538 F.Supp. 819, 828 (E.D.Mich.1982), *aff'd as modified*, 727 F.2d 560 (6th Cir.1984); *Horizon House Developmental Services, Inc. v. Township of Upper Southampton*, 804 F.Supp. 683, 696 (E.D.Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir.1993).

■ In our own jurisdiction, the Seventh Circuit has held that discriminatory intent on the part of government officials may be inferred from community racial hostility. In *Gautreaux v. Chicago Housing Authority*, 436 F.2d 306 (7th Cir.1970), *cert. denied*, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971), the court of appeals held it was not an abuse of discretion for the district court to order the housing authority to comply with a 1969 order by submitting proposed sites for desegregated public housing within a specific

timetable. The district court had entered the 1969 order pursuant to its finding that "while defendant CHA did not necessarily harbor a subjectively racist attitude, it had intentionally maintained a system of public housing which discriminated on racial grounds with respect to the selection of sites for public housing in the City of Chicago, and with respect to tenant assignments within the public housing system," including a "preclearance" procedure whereby any proposed site for public housing was informally submitted to the alderman of the ward in which the housing project was to be located for approval prior to formal submission to the Chicago Plan Commission and the Chicago City Council. *Id.* at 307. The waiting list and occupancy rate for these sites was 90% African–American and most of the aldermen to whom these sites were submitted for "preclearance" vetoed the sites "because of the unfavorable reaction thereto by residents of their ward." *Id.* at 308. The court affirmed the district court's order "[i]n view of the fact that HUD-approved sites for 1500 Dwelling Units were awaiting submission to the City Council and that the arguments put forward in favor of delaying submission were based on political considerations and community hostility, reasons which had been properly rejected by the lower court in the original litigation." *Id.* at 313.

Contrary to the City's contention, the circumstances which led to the decision in *Gautreaux* are not so far from the facts alleged in the present case. Public schools have suffered from a history of segregation at least as long and as invidious as that suffered by public housing. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Consent Decree entered in *United States v. Board of Education*, 80 C 5174 (N.D.Ill.). The fact that the present case involves only one school, compared to the 1500 housing sites at stake in *Gautreaux*, does not provide a relevant ground for distinction.

The court rejects defendants' arguments that plaintiffs have failed properly to plead discriminatory intent.[3] By alleging that the

---

**3.** The City has imagined a scenario in which, as a

result of this opinion, every statute which dispa-

PBC and the City delayed the zoning proceedings and revised the plans in response to community opposition which was based, in significant part,[4] on racial animus, the plaintiffs adequately have alleged discriminatory intent. Combined with the allegations regarding the cap on enrollment, the local recruitment provision, the limitations on the physical size of the building and its ability to expand economically, and the limitations placed on the future uses of the land, plaintiffs have adequately pleaded disparate effect and discriminatory intent for purposes of the Equal Protection Clause. Accordingly, defendants' motions to dismiss Count I are denied.

### Counts II and III: Title VI and Regulations

Plaintiffs complain that the conduct of the PBC and the City in failing to proceed with the original architectural plans and otherwise preventing the construction of an appropriate CHSAS expansion has violated plaintiffs' rights under Title VI and its regulations.[5] Sec.Am.Compl. ¶¶ 103, 104. The PBC and the City have moved to dismiss these claims primarily on the ground that plaintiffs have failed to allege that either defendant "receives" federal funds. Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

### A. The City

■■■ It is undisputed that the City received millions of dollars in federal financial assistance in 1993. Sec. Am. Compl. ¶ 98. However, the City claims that none of those funds are "relevant" for purposes of Title VI because they were not received or used in connection with the CHSAS expansion. City's Mem. at 4. In essence, the City is arguing that because it does not use the federal money to fund any "program or activity" which is alleged to discriminate, it is not subject to Title VI. Plaintiff disagrees and has constructed a long, attenuated formula demonstrating how money received by the City eventually trickles down to CHSAS students via the CBOE and the Job Training Partnership Act ("JTPA"), and how the failure to expand the CHSAS limits the number of minority students who can take advantage of the JTPA programs, who are discriminated against as a result.

Prior to 1988, the strictures of Title VI applied only to an institution or government entity's specific programs that received federal funds. This was the view expressed in

---

rately impacts a particular group will be invalidated on the mere allegation that one constituent made his or her racist views known to one legislator. According to the City, "[t]he incentive would be for legislators to make sure that they have absolutely no contact with their constituents, for fear of hearing something that would fatally taint an otherwise lawful measure." City's Mem. in Reply on Mot. to Dismiss Sec.Am.Compl. at 25 n. 25. This far-fetched theory ignores the established standards for imputing racial animus from the community to the government body. Racial animus must be a "significant" factor in the community position. *Yonkers Board of Educ.*, 837 F.2d at 1224. The "bigoted comments of a few citizens," *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), are not sufficient to demonstrate discriminatory intent. Discovery will reveal whether the community's racial animus truly is significant.

4. The *Seventh Circuit* recently has indicated that the "fact that discrimination may have an ulteri-

or motive that is not discriminatory does not make it any the less intentional." *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir.1994) (reversed district court's dismissal of intentional discrimination claim).

5. It is not clear from the second amended complaint whether plaintiffs are asserting a claim against the CBOE for violation of Title VI, 42 U.S.C. § 2000d–4a. Section 2000d–4a(2)(B), states that the operations of "a local educational agency ... or other school system" which receives federal funds qualifies as a "program or activity" for purposes of liability under the statute. In their prayer for relief, plaintiffs seek injunctive relief against the CBOE, yet nowhere in their second amended complaint do they specify the causes of action under which they seek to hold the CBOE liable. Nor does the CBOE's answer shed any light on this issue. Accordingly, plaintiffs may file a third amended complaint within fourteen days after entry of this order for the sole purpose of clarifying their position against the CBOE and specifying which causes of action are applicable to the CBOE.

*Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), where the Supreme Court found that regulations promulgated under Title IX (which was patterned on Title VI) were subject to certain program-specific limitations. Only a program which actually benefited from the receipt of federal funds administered under Title IX was subject to the Title IX regulations prohibiting discrimination. *Id.* at 572, 104 S.Ct. at 1220. Relying on *Grove City,* the Seventh Circuit affirmed a district court decision denying plaintiffs' motion for a preliminary injunction based on an alleged violation of Title VI regulations in *David K. v. Lane,* 839 F.2d 1265, 1274 (7th Cir.1988). The court held that the plaintiffs' regulatory claim had little likelihood of success on the merits because they had failed to demonstrate a connection between the defendant Illinois Pontiac Correctional Center's receipt of federal funds earmarked for one specific program and the particular programs alleged to have had a discriminatory effect on plaintiffs. *Id.*

The landscape of Title VI changed in 1988 when Congress overruled the *Grove City* decision's narrow reading by passing the Civil Rights Restoration Act of 1987 ("CRRA"), Pub.L. No. 100–259, codified under 42 U.S.C. § 2000d–4a. The CRRA reinstates a broader concept of "program or activity" by adding to Title VI an explicit definition for that phrase:

For the purposes of this subchapter, the term "program or activity" and the term "program" mean all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; [or] ...

(2)(B) a local educational agency ..., system of vocational education, or other school system; [or] ...

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal Financial assistance.

42 U.S.C. § 2000d–4a (1988). This statute was intended to ensure that the various civil rights statutes "would apply to the entirety of any state or local institution that had a program or activity funded by the federal government." *Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir.1991). In that way, the term "program or activity" was expanded from a specific program or specific activity to include "all of the operations" of the institution that conducted the program or activity. *Id.*

Despite the broadening of the definition, the City of Chicago still is not within the scope of Title VI's coverage. The City is not an "operation" of "a department, agency, special purpose district, or other instrumentality of a State or of a local government," or of "the entity of such State or local government that distributes such assistance," or of any of the other entities enumerated in § 2000d–4a. Rather, the City is a municipality and, as such, it does not fit within the definition of "program or activity" for purposes of Title VI.

Other courts in this jurisdiction have reached the same conclusion. For example, in *Schroeder v. City of Chicago,* 715 F.Supp. 222 (N.D.Ill.1989), a former employee of the Chicago fire department sued the City and two of its employees under the Rehabilitation Act of 1973, 29 U.S.C. § 794,[6] for discriminating against him based on his past history of treatment for alcoholism. Plaintiff's complaint alleged that "the City of Chicago is a program or activity receiving federal financial assistance." *Id.* at 225. After examining both the language of the CRRA and its legislative history, Judge Bua concluded:

Section 504(b)(1)(A) of the Rehabilitation Act defines "program or activity" as the

---

**6.** The Rehabilitation Act closely tracks the language of Title VI, which was its model. Accordingly, the definition of "program or activity" for purposes of the Rehabilitation Act is essentially identical to its definition for purposes of Title VI.

operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government." The City of Chicago does not fit this statutory definition of "program or activity." The City is not a department or instrumentality of a local government. Rather, as a full-blown municipality, the City embodies an entire local government. *Id.* (cites omitted). Therefore, the court granted defendants' motion to dismiss the Rehabilitation Act claim against the City.[7]

The Seventh Circuit has not examined the City's status as a "program or activity" directly. However, in *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir.1991), the court affirmed dismissal of the Rehabilitation Act claim against the City, saying: "[T]he amendment was not, so far as we are able to determine—there are no cases on the question—intended to sweep in the whole state or local government, so that if two little crannies (the personnel and medical departments) of one city agency (the fire department) discriminate, the entire city government is in jeopardy of losing its federal financial assistance." Based on these authorities, it is clear that the City is not a "program or activity" for purposes of Title VI and its regulations.

■ The City also contends that plaintiffs lack standing to allege a violation of Title VI. To have standing to bring a private action pursuant to Title VI, a plaintiff must be an "intended beneficiary of, an applicant for, or a participant in a federally funded program." *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 (7th Cir.1980). Plaintiffs allege that some of the federal money received by the City is "allocated and dispersed [sic] to students at CHSAS, through the Job Training Partnership Act." Sec.Am.Compl. ¶ 99. At most, this amounts to a claim that some students at the CHSAS, who may or may not be minorities, benefitted from the Job Train-

ing Partnership Act, a program which is not even alleged to discriminate against minority students. In the absence of specific allegations concerning which plaintiffs are affected and how they are discriminatorily affected, the court can only conclude that plaintiffs lack standing to assert a claim under Title VI. *See Allen v. City of Chicago*, 828 F.Supp. 543, 565 (N.D.Ill.1993) (dismissing Title VI claim against the City because plaintiffs failed sufficiently to allege their third party beneficiary status). Accordingly, the Title VI claim is dismissed as to the City.

### B. *The PBC*

■ Like the City, the PBC argues that it is not subject to Title VI because it does not receive federal funds. Local property taxes—not federal funds—provide the financing for the PBC's projects, including the CHSAS. Plaintiffs admit the PBC itself does not receive any federal funds, but contend that the PBC still is liable under Title VI by virtue of its contractual relationship with the CBOE.

■ All of the parties place far too much importance on whether or not the defendants actually receive federal funding. In the post-CRRA era, whether or not an entity receives federal funds is no longer the *sine qua non* of a Title VI action. Consistent with the broad definition of "program or activity," courts have rejected such a formalistic approach in favor of examining the defendant's relationship to the entity receiving the federal funds.

For example, in *Association of Mexican–American Educators v. State of California*, 836 F.Supp. 1534 (N.D.Cal.1993) (Orrick, J.), the plaintiffs brought a class action lawsuit against the State of California and the California Commission on Teacher Credentialing ("CTC") challenging the use of the California Basic Educational Skills Test as a require-

---

7. *See also Goerlich v. Davis*, No. 91 C 1743, 1991 WL 195772, *4 (N.D.Ill. Sept. 25, 1991) (Conlon, J.) (dismissing Title VI claim against the City because although "[plaintiff] alleges that the city receives federal funds, he fails to make the required allegation of a relationship between his claims and any particular federally funded program"); *Tkatch v. City of Chicago*, No. 91 C 1663, 1991 WL 192192, *3 (N.D.Ill. Sept. 26, 1991) (Plunkett, J.) (dismissing Rehabilitation Act claim against the City because plaintiff failed to indicate which, if any, federally-funded program was implicated by plaintiff's claim, and, *sua sponte*, sanctioning plaintiff's attorney $250.00 because the claim was precluded by the language of the statute).

ment for certification to teach in California public schools. It was undisputed that the CTC had not received any federal financial assistance during the relevant time period. Nonetheless the court held that the CTC was a proper defendant under Title VI. As the court pointed out, a requirement that the entity sued must be the entity that receives the federal funds would represent a return to *Grove City*'s "program-specific" limitation on the statute's coverage. *Id.* at 1543. "Defendants' argument is predicated upon limiting 'program or activity' based upon the words that follow that term in § 2000d: 'receiving Federal financial assistance.' Such a limitation, however, would render § 2000d–4 superfluous, a result the Court must strive to avoid." *Id.*

This court agrees with Judge Orrick's reasoning.[8] It is not sufficient to avoid Title VI's reach that the PBC does not receive any federal funding. Rather, the relevant consideration is whether the PBC is "part" of "the operations" of one of the entities listed in § 2000d–4a which "is extended ... federal financial assistance." Thus, in *Association of Mexican–American Educators*, because the CTC was "part" of "the operations" of one of the entities listed in § 2000d–4a (*i.e.* the California school system, which "is extended" a large sum of "federal financial assistance" on an annual basis), it was a "program or activity" under Title VI. *Id.* at 1544.

In the present case, there is no question that the PBC is a local governmental agency that could be liable under Title VI. However, plaintiffs have failed to alleged any facts establishing that the PBC was involved in or somehow connected to any federal funds. Instead, plaintiffs' allegations are limited to describing the federal funds received by the CBOE and then, in conclusory fashion, stating that the PBC is a party to a contract with the CBOE:

> Defendant CBOE has received and disbursed annually millions of dollars from federal educational and other monetary

grant programs that are subject to the requirements of 42 U.S.C. § 2000d *et seq.* and the administrative regulations promulgated to effectuate Title VI. Sec. Am. Compl. ¶ 95.

> PBC is a joint and significant partner and a party to a contractual relationship with CBOE in a program subject to Title VI coverage. *Id.* at ¶ 96.

These conclusory allegations are insufficient to show that the PBC administered the CBOE's federal funds, benefitted from the CBOE's federal funds, or was connected in any other way to the federal funds received by the CBOE. Thus, plaintiffs cannot benefit from the holding in *Association of Mexican–American Educators* whereby an entity which does not receive federal funds still may be liable under Title VI.

■ Nonetheless, plaintiffs still seek to hold the PBC liable under Title VI as a "necessary and appropriate" party under Rule 19. According to plaintiffs, in order to foreclose the possibility that "the PBC will attempt to enforce its Lease, as modified with the revised plans and ordinance, against the CBOE, the PBC is a necessary party to the Title VI statutory and regulatory claims if plaintiffs are to receive meaningful and 'complete relief,' under Counts II and III of the complaint, see Rule 19, F.R.Civ.Pro." Pl. Mem. in Opp. to Mot. to Dismiss Sec.Am. Compl. at 9–10 n. 1.

Plaintiffs misconceive Rule 19. Even assuming the PBC is a "necessary" party to the Title VI claim, that status does not automatically confer subject matter jurisdiction on the court to hear that claim against the PBC. On the contrary, "Rule 19 alone cannot give the district court subject matter jurisdiction over the dispute ... because Rule 19 is not a source of federal jurisdiction." *Securities & Exchange Comm'n v. Cherif,* 933 F.2d 403, 413 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 966, 117

---

**8.** However, insofar as Judge Orrick held that the State of California may be sued under Title VI "at least where the state is the entity responsible for the Title VI violation," his holding is distinct from this court's holding with respect to the City of Chicago. The approach the court adopts here

with respect to the City is set forth in *Schroeder v. City of Chicago,* 715 F.Supp. 222, 225 (N.D.Ill. 1989) ("as a full-blown municipality, the City embodies an entire local government," and, as such, is outside the scope of Title VI).

L.Ed.2d 131 (1992); *see also* 3A Moore's Federal Practice ¶ 19.04[2.–1] (2d ed. 1992).

In *Cherif,* the SEC brought a civil enforcement action against a former bank employee (Cherif) for violation of the anti-fraud provisions of the federal securities laws. The district court entered an injunction preventing Cherif from future trading, freezing Cherif's assets, and freezing two accounts of nominal defendant Sanchou. The SEC alleged that Cherif used Sanchou's accounts to facilitate his illegal trades and that the profits from Cherif's trading remained in Sanchou's account. However, the SEC did not allege that Sanchou himself had violated any securities laws. On appeal, the SEC argued that the injunction was properly entered as to Sanchou because he was a "necessary and appropriate" party pursuant to Rule 19(a) without whom the court could not grant complete relief. The court found that Rule 19 "supplies a mechanism by which interested parties can be joined, but it presumes the preexistence of subject matter jurisdiction over some cause of action alleged against the defendant." *Id.* The court therefore rejected the district court's "untenable" suggestion that Rule 19 supported the exercise of jurisdiction over Sanchou and remanded for a determination of Sanchou's proper status in the case.

The same principles apply to the present case. Before plaintiffs can argue that the PBC is a necessary party under Rule 19, they first must establish a basis for the court's subject matter jurisdiction. By conceding that the PBC is not subject to Title VI, plaintiffs essentially have admitted that the court has no subject matter jurisdiction with respect to this claim. Therefore, the court need not even address the question of whether the PBC is a necessary party because subject matter jurisdiction, a precondition to Rule 19 joinder, is absent.

Therefore, Counts II and III of plaintiffs' second amended complaint are dismissed.

### Count IV: Violation of the Consent Decree

Plaintiffs allege that the "conduct of the PBC in failing to proceed with the original architectural plans and the conduct of the PBC and City in otherwise preventing the construction of an appropriate CHSAS expansion and an increase in student enrollment has substantially obstructed the Consent Decree and unduly interfered with the discretion of the CBOE under the Consent Decree." Sec.Am.Compl. ¶ 105. The Consent Decree was entered into pursuant to a discrimination suit brought by the United States against the CBOE in 1980 (*"United States v. Board of Education "*), in order to remedy the lingering effects of past racial and ethnic segregation in the Chicago public schools. As a result, the CBOE is required to develop and implement a system-wide plan to remedy the present effects of past segregation of African–American and Hispanic students.

Defendants argue that plaintiffs lack standing to enforce the Consent Decree because plaintiffs were not parties to it. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975), the Supreme Court held that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."

Despite its seemingly sweeping proscription, *Blue Chip Stamps* has been interpreted narrowly so that certain third party beneficiaries still may sue to enforce a consent decree. Proceeding under the theory that the Supreme Court had not meant to eviscerate Rule 71, courts have created an exception for would-be plaintiffs who are the intended, versus incidental, third party beneficiaries of the decree. *See Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 288 (D.C.Cir.1993); *Hook v. State of Arizona, Dep't of Corrections,* 972 F.2d 1012, 1015 (9th Cir.1992).

This exception, however, does not apply to consent decrees resulting from actions brought by the government. As stated in *Beckett,* "[o]nly the Government can seek enforcement of its consent decrees; therefore, even if the Government intended its consent decree to benefit a third party, that party could not enforce it unless the decree so provided." 995 F.2d at 288 (cites omitted); *see also National Union Electric Corp. v. Emerson Electric Co.,* No. 81 C 1912, 1981 WL 2132 (N.D.Ill. July 23, 1981) (third party

lacked standing to enforce consent decree between defendants and United States). This interpretation derives from a general contract principle that third party beneficiaries of a government contract generally are assumed to be merely incidental beneficiaries, and may not enforce the contract absent clear intent to the contrary. *See* Restatement (Second) of Contracts § 313(2) & cmt.a; *Price v. Pierce,* 823 F.2d 1114, 1121–22 (7th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988).

■ Courts look to the language of the consent decree itself to determine whether a clear intent to permit third parties to enforce the decree exists. For example, in *Berberich v. United States,* 5 Cl.Ct. 652, 656 (1984), *aff'd,* 770 F.2d 179 (Fed.Cir.1985), the town residents sued the town to enforce the provisions of a contract between the Corps of Engineers and the town. Unable to find any evidence in the contract conferring third party beneficiary status on the town residents, the court held that the Town was not liable to its residents for breaching its obligations under the contract. *Id.* at 657.

■ In the present case, plaintiffs do not claim that the Consent Decree itself identifies them as the intended third party beneficiaries. Rather, they point to the complaint filed in *United States v. Board of Education* which identifies students in the Chicago Public Schools and their parents as the persons on whose behalf the action was initiated. However, the complaint is not synonymous with the Consent Decree. Had the parties intended students in the Chicago Public School System or their parents to be third party beneficiaries, they easily could have said so in the Consent Decree. *See, e.g., Coca–Cola Bottling Co. v. Coca–Cola Co.,* 654 F.Supp. 1419, 1439, 1445 (D.Del.1987), *aff'd,* 988 F.2d 386 (3d Cir.1993) (consent decree specifically provided it applied to the "parties hereto and their respective successors and assigns"); *Ennels v. Alabama Inns Assocs.,* 581 F.Supp. 708 (M.D.Ala.1984) (consent decree prohibited defendant from "discriminat-

ing, on the basis of race, against any named plaintiff or any other black person").

Moreover, Judge Kocoras of this district, who retains jurisdiction over enforcement of the Consent Decree, has found that plaintiffs' allegations do not implicate the Consent Decree. *See United States v. Board of Education,* No. 80 C 5124, 1994 WL 159366 (N.D.Ill. April 25, 1994). Plaintiffs in the present case moved for intervention in *United States v. Board of Education* based on their belief that their allegations implicate the Consent Decree. In rejecting plaintiffs' motion Judge Kocoras stated:

> The Consent Decree from the *Board of Education* case identified magnet schools as a permissible means for achieving desegregation in the schools. However, it did not compel the implementation of magnet schools, nor did it prescribe the size of any particular school. The Consent Decree focussed on means for achieving system-wide desegregation and providing remedial programs where desegregation was not achieved. The appropriate architectural design and maximum enrollment of a single school are discrete issues that do not have system-wide implications. Therefore, these issues do not necessarily implicate the Consent Decree and do not require adjudication before the Court that is charged with enforcement of the Consent Decree.

*Id.* at *3. Because the court holds that plaintiffs lack standing to enforce the Consent Decree, the court need not reach the merits of plaintiffs' allegations. However, if and when the time comes to address a claim brought by a proper party for violation of the Decree, Judge Kocoras's opinion certainly will be entitled to a measure of deference.

Count IV for violation of the Consent Decree must be dismissed.[9]

### Count V: Claim for Violation of Lease

■ Plaintiffs' fifth claim for relief alleges that the "conduct of PBC violates the Lease entered into by the PBC and the CBOE and constitutes a breach of contract

---

**9.** Although Count IV is dismissed because plaintiffs lack standing to enforce the Consent Decree, the facts surrounding the Decree and its poten-

tial violation still are relevant to plaintiffs' claim for violation of the Equal Protection Clause.

under the laws of Illinois." Sec. Am. Compl. ¶ 106. This claim fails for the same reasons Count IV fails: plaintiffs cannot show that they were the intended beneficiaries of the government contract.

As discussed *supra*, every contract made by the government is presumed to be for the benefit of its citizens. Therefore, individual citizens are entitled to sue to enforce the contract only where the language of the contract itself manifests a specific intent to give individual citizens enforceable rights to compensation for its breach. As evidence of their standing to sue under the Lease, plaintiffs point to the language in the Lease which states that the PBC exists for the purpose of "construction" and "rehabilitation" of public buildings "for use by governmental agencies in the furnishing of essential governmental health, safety and welfare services to its citizens." Lease at 1. The Lease further acknowledges that the CBOE is entering into the lease for the "best interests of the public schools" and cites an "urgent need" for improvements." *Id.* at 1–2. However, this language indicates only that the public schools and governmental agencies are the intended third party beneficiaries of the Lease, not the individual students and future applicants of the CHSAS or their parents.

In any event, the court need not guess as to who is or is not a third party beneficiary. The Lease explicitly identifies its beneficiaries, and plaintiffs are not among them: "This Lease shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns and shall also inure to the benefit of the owners of any of the Bonds, as their interests may appear." *Id.* § 21 at 15. Had the parties to the contract intended plaintiffs to be able to sue to enforce it, plaintiffs would have been named along with the other beneficiaries listed in section 21. Because they did not, plaintiffs lack standing to sue for violation of the Lease and Count V is dismissed.

## CONCLUSION

The PBC and the City's Motions to Dismiss are granted with respect to Counts II, III, IV and V of plaintiffs' second amended complaint. These counts are dismissed with prejudice.