SAMARITAN INNS, INC.,
Appellee/Cross–
Appellant,

v.

DISTRICT OF COLUMBIA, et al.,
Appellants/Cross–Appellees.

Nos. 96–7105, 96–7106 and 96–7109.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1997.

Decided June 6, 1997.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, Washington, DC, argued the cause for appellants/cross-appellees, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the briefs.

John R. Risher Jr., Washington, DC, argued the cause for appellee/cross-appellant, with whom James P. Mercurio was on the briefs.

Before WALD, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The District of Columbia and two of its employees, Hampton Cross and Patricia A. Montgomery (collectively "the District") appeal a judgment awarding approximately $2.4 million in compensatory damages, $1,000 in punitive damages, and $684,624 in attorney's fees and costs to Samaritan Inns, Inc., for violations of the Fair Housing Act, 42 U.S.C. §§ 3601–3631. The District does not contest the district court's finding that it violated the Act by issuing an illegal stop-work order that temporarily prevented Samaritan Inns from completing renovations to a residential housing facility for former drug and alcohol abusers, and by initiating proceedings to revoke the facility's construction permits. Rather, the District contends that the record does not support the district court's award of compensatory damages for "lost" and "delayed" charitable contributions to Samaritan Inns, approximately $2.3 million, or the award of punitive damages against Cross and Montgomery. Samaritan Inns cross-appeals the district court's denial of relief on its claim that the District violated the Fair Housing Act by failing to make reasonable accommodations in its zoning laws.

We hold that because Samaritan Inns did not establish with reasonable certainty that the District's actions caused any potential contributors to refrain from making donations to its capital campaign, it is not entitled to recover damages for "lost" contributions. We further hold that Samaritan Inns may recover damages for "delayed" capital contributions, but that the district court's findings as to the duration of the delay are clearly erroneous. We affirm the award of punitive damages against Cross and Montgomery. Accordingly, we reverse the awards of compensatory damages for "lost" and "delayed" capital contributions, and we remand the case for recalculation of the award for "delayed" contributions and for reconsideration of the attorney's fees award.

## I.

Samaritan Inns is a tax-exempt charitable corporation that provides below-market rental housing to former drug and alcohol abusers in the District of Columbia. It operates three "Inns" that provide short-term transitional housing, and two "Houses"—Lazarus House and Tabitha's House—that provide longer-term housing. As a condition of living in either the Inns or the Houses, all tenants must have completed an approved substance abuse program, must obtain and maintain gainful employment, and must refrain from using drugs and alcohol.

## A.

**Background to the litigation.** Lazarus House opened in 1991. Within two years, it received nearly 800 applications from men and women who met the criteria for living there. Because it was unable to meet this demand, Samaritan Inns decided to open a second House modeled after Lazarus House and, in 1992, purchased the building now known as Tabitha's House. In 1993, the District issued the demolition and building permits necessary to allow Samaritan Inns to renovate Tabitha's House and operate it as a boarding house.[1] Shortly after work on the project began, however, residents of the surrounding community began to express opposition to the housing facility. On September 22, 1993, David Erickson, the president of Samaritan Inns, met with community residents to discuss the Tabitha's House project. Also attending the meeting were appellant Cross, then the Acting Director of the D.C. Department of Consumer and Regulatory Affairs; Joseph Bottner, the D.C. Zoning Administrator; and the Honorable Charlene Drew Jarvis, D.C. Council Member for Ward 4, in which Tabitha's House is located. At the meeting, community residents argued that Tabitha's House could not be considered a boarding house under the zoning laws because it would not serve meals, and demanded that Cross issue an order stopping all work on the project.

Erickson subsequently met with the Zoning Administrator and community residents in an effort to resolve issues relating to the Tabitha's House meal plan. Opponents of the project, including the Ward 4 Council Member, continued to press for a stop-work order. On October 7, 1993, the Zoning Administrator issued an order requiring Samaritan Inns to stop all construction work on Tabitha's House. The order contained no discernible explanation of why it had been issued. Although the Zoning Administrator

shortly thereafter recommended to Cross that the order be vacated, Cross refused to rescind it, claiming that the Mayor had decided to support the protesters. On October 18, 1993, appellant Montgomery, the Acting Director of the D.C. Building and Land Regulation Administration in the Department of Consumer and Regulatory Affairs, sent Erickson a letter purporting to revoke the building and demolition permits for Tabitha's House on the ground that Samaritan Inns had misrepresented to the District that the building would be used as a boarding house.

The District later acknowledged that the October 18 revocation order was invalid because Samaritan Inns had not received a hearing. On November 19, 1993, Montgomery issued a Notice of Intent to Revoke Permit, reiterating the charge that Samaritan Inns had falsely represented in its permit applications that it intended to operate the Tabitha's House property as a "boarding house." The notice also charged that Lazarus House, the model for Tabitha's House, was being operated as a "community-based residential facility," rather than a boarding house.[2] At Cross's direction, a citation charging that Lazarus House had violated its certificate of occupancy was also issued, but not served. Samaritan Inns requested an expedited hearing, and on December 28, 1993, an administrative law judge found that the District had not proven any false statements in the permit applications for Tabitha's House. The judge also found that there was no evidence that Lazarus House was being operated as a community-based residential facility or that Samaritan Inns intended to provide counseling or residential services at Tabitha's House that would make it a community-based residential facility under the zoning laws. The judge further found that even if Samaritan Inns did not intend to provide meals, Tabitha's House

1. Under the zoning regulations, a "boarding house" is "a building or part of a building that provides, for compensation, meals or lodging and meals to three (3) or more guests on a monthly or longer basis." D.C. Mun. Regs. tit. 11, § 199.1 (1995).

2. Under the zoning regulations, a "community-based residential facility" is "a residential facility

for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living." D.C. Mun. Regs. tit. 11, § 199.1 (1995). If a facility is a community based residential facility, it cannot be deemed to constitute any other use permitted by the zoning regulations. Id.

would still qualify as a "rooming house," rather than a "boarding house." [3] Under the zoning regulations, both boarding houses and rooming houses are uses that are permitted as of right in the area where Tabitha's House is located, an R–5 residential zone. D.C. Mun. Regs. tit. 11, §§ 330.6, 350.4(a) (1995). If Tabitha's House had been classified as a community-based residential facility, the number of occupants permitted in the facility would have been limited, and Samaritan Inns would have been required to obtain permission from the Board of Zoning Adjustment ("BZA") to operate the facility.[4]

During the course of this controversy, the stop-work order remained in effect. On December 20, 1993, Samaritan Inns filed the instant lawsuit alleging violations of District of Columbia law, the Civil Rights Act of 1871, the Fair Housing Act, and the Due Process Clause of the Fifth Amendment. On January 12, 1994, the District rescinded the stop-work order, and on March 15, 1994, the parties entered into a consent order, pursuant to which the District agreed not to:

> revoke or seek to revoke plaintiff's building permits relating to Tabitha's House, nor issue a stop-work order pertaining to work being done on Tabitha's House pursuant to those permits, except as may be necessary either to protect the public from a dangerous physical condition arising at

Tabitha's House or on the basis of information not of record which would warrant revocation or a stop-work order under the law. . . .

Despite this agreement, Cross subsequently caused the citation against Lazarus House to be served on March 21, 1994. The District canceled that citation on April 6, 1994.

The construction and renovation of Tabitha's House was completed in June 1994. In July, the Zoning Administrator issued a certificate of occupancy for its use as a rooming and boarding house. Opposition from the surrounding community continued, and residents appealed the issuance of the certificate of occupancy to the BZA. In September 1996, the BZA denied the appeal.

After a bench trial in February 1995, the district court entered judgment for Samaritan Inns on most of its Fair Housing Act claims. The district court found that the tenants of Tabitha's House and Lazarus House were persons with a "handicap" under § 802(h) of the Act, 42 U.S.C. § 3602(h),[5] and that the District's actions were motivated by discriminatory intent, had a discriminatory effect, and "coerced or intimidated" Samaritan Inns from continuing its efforts to complete and open Tabitha's House, in violation of §§ 804 and 818 of the Act, 42 U.S.C. §§ 3604, 3617.[6] The district court found,

---

**3.** Under the zoning regulations, a "rooming house" is "a building or a part of a building that provides sleeping accommodations for three (3) or more persons who are not members of the immediate family of the resident operator or manager, and in which accommodations are not under the exclusive control of the occupants." D.C. Mun. Regs. tit. 11, § 199.1 (1995).

**4.** See D.C. Mun. Regs. tit. 11, §§ 357–360 (1995) (defining permissible uses of various types of community-based residential facilities in R–5 zones).

**5.** 42 U.S.C. § 3602(h) provides:

"Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities;

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment,

but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

Recovering alcoholics or drug abusers who do not currently use illegal drugs may be persons with a "handicap" under the Fair Housing Act. H.R.REP. No. 100–711, at 22 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2183; *see also United States v. Southern Management Corp.*, 955 F.2d 914 (4th Cir.1992).

**6.** 42 U.S.C. § 3604(f)(1) makes it unlawful to:

discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

42 U.S.C. § 3617 makes it unlawful to:

coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment

however, that Samaritan Inns had failed to present persuasive evidence that the District had violated the "reasonable accommodations" provision of the Fair Housing Act.[7] In light of its disposition, the court declined to address Samaritan's Due Process claim. The court also concluded that neither Cross nor Montgomery was entitled to qualified immunity. The court awarded Samaritan Inns $2,404,903 in compensatory damages, and assessed punitive damages of $500 each against Cross and Montgomery. It also awarded Samaritan Inns attorney's fees and costs of $684,624.83, and ordered the District to cease and desist its discriminatory practices.

### B.

**The damages award.** More than $2.3 million of the compensatory damages award was intended to compensate Samaritan Inns for harm to a planned capital fundraising campaign, the "Next Steps Initiative." When the Tabitha's House controversy began, Samaritan Inns was planning to solicit $8 million in donations to finance the cost of constructing five new Inns providing short-term housing, two new Houses similar to Lazarus House and Tabitha's House, and a support center, and to create a $2 million endowment fund to help support the operating costs of the residences. Once the controversy began, however, Samaritan Inns decided not to commence this campaign in 1994, as originally planned. The district court found that "the devastating impact of the [District's] actions, commencing with the issuance of the stopwork order on October 7, 1993," effectively prevented Samaritan Inns from achieving its fundraising goals because it "chilled the interest in potential donors and previously active Samaritan Inns board members in donating to and working with [Samaritan Inns] until the cloud of controversy and delay lifted."

The evidence to support the district court's conclusion came primarily from Erickson and John Derrick, the president of Potomac Electric Power Company ("PEPCO"), who was chairman of the Tabitha's House fundraising board. Erickson testified that once the stopwork order was issued, the conflict concerning Tabitha's House became "almost the sole focus" of his meetings with the fundraising board, and the board members began to evidence a lack of interest in continuing to work with Samaritan Inns. Derrick testified that the stop-work order "basically just knocked the pins right out from underneath of us." In Derrick's view, the District's actions, including those of the Ward 4 Council Member, raised serious doubts as to whether Samaritan Inns would be able to continue to operate in the District of Columbia, and made it impossible to go forward with the Next Steps Initiative. In the wake of the stop-work order, the board was unable to raise approximately $196,000 needed to complete the Tabitha's House campaign.[8] However, Erickson and his staff were nonetheless able to raise most of the funds necessary to close this shortfall.

To calculate the dollar impact of the District's actions on the Next Steps Initiative, Erickson assumed that some portion of the potential contributions that he would have solicited had been irretrievably "lost" and that the remainder had merely been "delayed." He calculated the total amount lost during 1994 and 1995 at $1,958,501. The district court accepted these figures, and found them to be consistent with the analysis of Samaritan Inns' economic expert, Dr. Richard Edelman. Edelman used the past pattern of contributions to Tabitha's House and three indexes of business and economic activity to estimate the amount that Samaritan could have expected to receive from October 1993 to October 1994. He then calcu-

---

of, any right granted or protected by section ... 3604 ... of this title.

**7.** 42 U.S.C. § 3604(f)(3)(B) provides that "[f]or the purposes of this subsection, discrimination includes ... a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...."

**8.** The district court found that the amount of this shortfall was $255,000. Erickson testified, however, that although the Tabitha's House campaign was $258,000 short of its goals at the time the stop-work order was issued, about $61,000 of that sum was already "in process," and thus, the total shortfall was approximately $196,000.

lated the amount of "lost" contributions as the difference between this expected level of contributions and the amount of contributions that Tabitha's House actually received during the same period. Using this methodology, Edelman estimated the total loss as between $2.05 million and $2.88 million.

Edelman further calculated that a delay of two years would reduce the value to Samaritan Inns of the funds Erickson had classified as "delayed" by $385,723. Edelman also calculated the loss in value of the funds that Erickson testified he had expected to receive for the completion of the Tabitha's House campaign from November 1993 to January 1994, concluding that a delay in receipt until June 1994 reduced their value to Samaritan Inns by $3,442.

The remaining testimony on the issue of damages to Samaritan Inns' fundraising prospects came from Dr. James Gelatt, a fundraising expert retained by the District. Gelatt and two other experts, one of whom was retained by Samaritan Inns and the other by the District, formed a panel that interviewed twenty-one past or potential donors to Samaritan Inns, selecting the interviewees from a list that Samaritan Inns had provided. The expert panel concluded that Samaritan Inns "continues to enjoy a positive reputation among those individuals, corporations, foundations, church groups, and other organizations from whom it has and would be anticipated in the future to solicit capital contributions." Gelatt testified that prior to the Tabitha's House controversy, Samaritan Inns had the capacity to meet the goals of the Next Steps Initiative, and that the expert panel had concluded that it would still be able to meet those goals "if it receives support in its efforts from the D.C. government and if the volunteer leadership is still 'on

board.'" Gelatt also testified that while the members of the panel "felt that we could comfortably say that there was some impact" on Samaritan Inns' fundraising capability as a result of the controversy, "none of us ... felt that we could quantify it." The expert panel was unable to conclude "whether the impact [was] an outright loss of contributions, or merely a delay in their receipt (based at least in part on Samaritan Inns' election not to proceed with the Next Steps Initiative)."

The district court found that the earliest prudent date for Samaritan Inns to begin the Next Steps Initiative was January 1996, and it accepted Erickson's estimates of "lost" and "delayed" contributions and Edelman's calculations of the diminution in value caused by the delay. The court therefore awarded Samaritan Inns $1,958,500 for "lost" contributions, $385,723 for the reduction in value of "delayed" donations to the Next Steps Initiative, and $3,440 for the reduction in value of the delayed donations to the Tabitha's House campaign. The district court also awarded $57,240 to compensate Samaritan Inns for construction delay and staff overhead, bringing the total award of compensatory damages to $2,404,903.

## II.

Section 813(c) of the Fair Housing Act, 42 U.S.C. § 3613(c), provides that "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages...." On its face, nothing in this language suggests any limit on the type of "actual damages" that a plaintiff may recover. Nor does the legislative history of the Act suggest any such limitation.[9] However,

9. The legislative history of the Fair Housing Act is "not too helpful." *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *but see Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 105–107, 99 S.Ct. 1601, 1610–12, 60 L.Ed.2d 66 (1979). Although § 813 was added in 1988, its relief provisions are virtually identical to those in former § 812 of the original Fair Housing Act, Pub.L. No. 90–284, § 812, 82 Stat. 88 (1968). The only significant differences between current § 813(c) and former § 812(c) are that the new provision eliminates a $1000 limit on punitive

damages and broadens the court's discretion to award attorney's fees. *See* H.R.Rep No. 100–711, at 39–40 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2200–01. Former § 812, like the remainder of the Fair Housing Act, derives primarily from an amendment offered on the Senate floor by the minority leader, Senator Dirksen. 114 Cong. Rec. 4570–73 (1968). The House ultimately agreed to the Senate amendments. *Id.* at 9621. Neither the House nor the Senate debates shed additional light on the meaning of the term "actual damages."

the parties have not cited a case, nor are we aware of one, in which a plaintiff has sought to recover damages under the Fair Housing Act for a defendant's interference with a fundraising campaign. Nonetheless, although the District contends that Samaritan Inns' claims of injury are unduly speculative and remote, it does not contend that such damages are not recoverable under § 813(c), upon a proper showing of causation.

■■■ Furthermore, we recognize that the language of the Act is "broad and inclusive" and must be given a "generous construction." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212, 93 S.Ct. 364, 366–67, 368, 34 L.Ed.2d 415 (1972); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, ——, 115 S.Ct. 1776, 1780, 131 L.Ed.2d 801 (1995). The Supreme Court has recognized that an action for damages under § 813 may be analogous to several different tort actions recognized at common law, including actions for defamation or intentional infliction of · emotional distress. *Curtis v. Loether,* 415 U.S. 189, 195 & n. 10, 94 S.Ct. 1005, 1009 & n. 10, 39 L.Ed.2d 260 (1974). Whatever the appropriate analogy, "[a] damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Id.* at 195, 94 S.Ct. at 1009.

■■ It cannot be gainsaid that just as the success of a for-profit business may depend on the good will of its customers, *see, e.g., Newark Morning Ledger Co., v. United States,* 507 U.S. 546, 555–56, 113 S.Ct. 1670, 1675–76, 123 L.Ed.2d 288 (1993), many charitable enterprises such as Samaritan Inns depend largely on donations from the public for their continued success. *See, e.g.,* Henry B. Hansmann, *The Role of Nonprofit Enterprise,* 89 YALE L.J. 835, 840–41 (1980). Furthermore, because such enterprises cannot sell equity shares, they often depend heavily

on outside contributions for capital financing. *Id.* at 877. By issuing a stop-work order because Samaritan Inns had purportedly misrepresented its intentions in its permit applications, and by otherwise obstructing the completion of Tabitha's House, the District could reasonably have foreseen that its actions might, at least temporarily, adversely affect Samaritan Inns' image as an efficient and reputable provider of charitable services, and thereby impair its ability to raise funds.[10] *Cf.* RESTATEMENT (SECOND) OF TORTS § 561(b) (1977); 2 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 5.3 (2d ed.1986). In related contexts, the court has recognized that for-profit corporations may recover lost or delayed profits. For example, in *ALPO Petfoods, Inc. v. Ralston Purina Company,* 997 F.2d 949 (D.C.Cir.1993), a competitor's false advertising campaign forced a dog food manufacturer to delay introduction of a new product into the national market, and the court upheld an award of damages under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) for the delay in receipt of profits. *See also Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1156 (D.C.Cir.1985). We see no principled basis on which to conclude that a nonprofit corporation, such as Samaritan Inns, may not recover contributions lost or delayed as a result of the District's unlawful interference with its activities if such interference was the proximate cause of the loss. *See* HARPER ET AL., *supra,* § 5.3.

■■ To determine whether Samaritan Inns has met this burden of proof to show loss and causation, we apply settled principles governing the recovery of damages for lost profits. Both parties agree that the relevant standards are stated in *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931):

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles

---

**10.** Of course, knowledgeable donors might well be aware that the path of construction and renovation of facilities like Tabitha's House is rarely smooth, and that various obstacles are likely to arise during such endeavors. *See, e.g.,* Linda Wheeler, *Capitol Hill Residents Protest Opening of New Homeless Shelter,* WASH. POST., Jan. 30, 1996, at B3; Steve Bates, *Alexandrians Fail to Stop Group Home,* WASH. POST., July 18, 1996, at V1; Laurie Goodstein, *A Mission Not All Will Embrace,* WASH. POST. Oct. 21, 1993, at A1.

of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Id.* at 563, 51 S.Ct. at 250. Thus, while a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate. *Office & Professional Employees Intern. Union, Local 2 v. FDIC*, 27 F.3d 598, 602 (D.C.Cir.1994); *Eureka Investment Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 938 (D.C.Cir.1984); RESTATEMENT, *supra*, § 912 & cmt. d; 1 ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.3, at 11 (4th ed.1992). Although a court will not permit a plaintiff to recover damages based on "mere speculation or guess," *see Wood v. Day*, 859 F.2d 1490, 1493 (D.C.Cir. 1988), the fact that an estimate is uncertain or inexact will not defeat recovery, once the fact of injury is shown. DUNN, *supra*, at 11.

■ Applying this framework to the District's contention that the record does not support the district court's award of more than $2.3 million to compensate Samaritan Inns for "lost" and "delayed" contributions to the Next Steps Initiative, we conclude that Samaritan Inns is not entitled to recover damages for "lost" contributions because it has not shown with reasonable certainty that any contributions were lost. The primary evidence concerning lost contributions came from Erickson, whose testimony did not provide any clear explanation as to why some of the funds Samaritan Inns expected to receive in 1994 and 1995 were irretrievably "lost," while the remaining amounts were merely "delayed." Erickson testified that he and his staff expected to solicit $4 million from ten potential donors in the first phase of the Next Steps campaign in 1994. Based on past giving patterns, he anticipated that 85% of that sum would be paid over a three-year period, and that the remaining 15%, or $600,000, would be paid in a lump sum during 1994. In his damages estimate, Erickson assumed that this $600,000 in lump-sum contributions had been "lost," but that the contributions expected to be paid over the three-year period had merely been delayed. Similarly, Erickson testified that in the second phase of the campaign, he planned to raise $650,000 from individual and corporate contributors, and that a fundraising board similar to those used in the Lazarus House and Tabitha's House campaigns was expected to raise $650,000. Again, he assumed that 85% of this sum would be paid over three years, and that the remaining 15%, or a total of $195,000, would be paid in a lump sum in 1994. Erickson also classified this $195,000 lump sum payment as "lost." In 1995, in the third phase of the campaign, Erickson planned to raise $300,000 from individual and corporate contributors, and expected the fundraising board to raise $850,000. Relying on historical patterns, Erickson assumed that 51% of the later donations would be paid on a multi-year basis. He classified the remaining 49%, or $563,000, as "lost" lump sum contributions.

Although he offered no testimony on this point, a four-page analysis prepared by Erickson indicated that he also planned to solicit $700,000 from foundations in 1994 and $850,000 in 1995. The analysis indicates that he expected approximately one-third of the foundation grants to have been "lost" rather than delayed. Erickson classified $250,000 of the foundation grants from 1994 and $200,000 of the grants from 1995 as "lost." Thus, Erickson concluded that $1,045,000 of the $2,996,667 Samaritan Inns expected to receive in 1994 and $913,500 of the $3,110,667 it had expected to receive in 1995 had been "lost."

Erickson's calculations regarding the "lost" contributions depended upon the premise, accepted by the district court, that fundraising is cyclical, and that in any given year contributors have a finite amount of money to donate to worthy causes. Thus, if circumstances prevented Samaritan Inns from soliciting money in a particular year, it would have irretrievably lost the opportunity to compete for the funds that were distributed in that year. Although it could conceiv-

ably raise the same amount of money in a different year, those contributions would come out of a different pool of funds. As Erickson explained, "[t]he people that have the capacity to give this kind of money give this generously . . . on a regular basis. That money that wasn't given in 1994 was given for something else. And so that money is not available to Samaritan Inns." This type of analysis is, in some respects, analogous to the manner in which contract law treats "lost-volume" sellers. If, for example, a buyer breaches a contract to purchase a car from an automobile dealer, the fact that the dealer is subsequently able to resell the car to a second buyer at the same price does not mean that the dealer has suffered no damage. Had it not been for the first buyer's breach, the dealer would have sold two cars, and earned profit on both. Hence, the dealer is entitled to recover the lost profit on the sale of one car. *See* U.C.C. § 2–708(2); *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972). Similarly, if a charity solicits money on an annual basis, a donation in one year will not compensate the charity for a donation "lost" in a prior year as a result of a defendant's misconduct. Had it not been for the misconduct, the charity would have received contributions in both years.

The problem with the "lost" contributions analysis is that the Next Steps Initiative, as Erickson explained it to the district court, was not an annual giving program. Rather, it was a capital fundraising drive of limited duration intended to raise a specified sum of money for the construction of new Houses and Inns and the creation of an endowment. Erickson acknowledged that "[c]apital projects are, by definition, special projects," and distinguished between the sums that Samaritan Inns raised for capital projects and the funds it raised to defray its operating costs. There is nothing in the record to suggest that Samaritan Inns would have continued to solicit capital contributions indefinitely once it received the $8 million it hoped to raise in 1994 and 1995. To the contrary, Erickson described the campaign as a three-year endeavor. Thus, there was no basis for the district court to conclude that Samaritan Inns had irretrievably lost any funds merely

because it lost the opportunity to compete for the funds available in 1994 and 1995. Given the limited duration of the capital campaign, Samaritan Inns could mitigate that loss by raising the amount that it planned to raise in 1996 and subsequent years. Assuming that it could raise the same amount at a later time, its damages would be limited to any injury caused by the delay.

Had the Next Steps Initiative been an annual giving campaign, rather than a capital campaign of limited duration, Edelman's analysis might well have provided a relevant measure of damages. As noted, Edelman estimated the amount of contributions that the Next Steps Initiative could have expected to receive between October 1993 and October 1994, relying on historical patterns of contributions to the Tabitha's House campaign and various indexes of business activity. His analysis indicated that Tabitha's House could have expected to receive between $2.05 and $2.8 million during that one-year period. If the Next Steps Initiative were an annual event expected to continue for the indefinite future, Edelman might have reasonably concluded that Samaritan Inns had irretrievably lost this sum of money. But neither Edelman's analysis nor any other evidence offered by Samaritan Inns explained why, under the circumstances, Samaritan Inns could not simply make up the "lost" contributions in later years and still achieve the goals of the campaign.

Furthermore, contrary to the district court's finding, Edelman's analysis did not "fully support" Erickson's damages estimates. Although both concluded that Samaritan Inns had suffered damages in the $2 million range, their calculations measured different things. Erickson assumed that the "lump-sum" contributions and a portion of the foundation grants that Samaritan Inns had expected to receive in 1994 and 1995 had been "lost," but that the remaining funds that Samaritan Inns had expected to receive had merely been delayed. If, as Erickson contended, the delay meant that Samaritan Inns had forever lost the opportunity to compete for those funds available in 1994 and 1995, it is unclear why the remaining contributions were not also "lost," rather than

delayed. Edelman, by contrast, conducted an analysis appropriate for an annual campaign, assuming that Samaritan Inns had "lost" the entire difference between the contributions it could have received in the wake of the Tabitha's House controversy and the contributions it actually received. Not only did he employ a different methodology, but he examined a different period of time. Erickson's calculations covered the two-year period from 1994 to 1995, while Edelman's covered the one-year period from October 1993 to October 1994. Given these significant differences in methodology, the fact that Edelman and Erickson reached similar estimates of Samaritan Inns' damages was mere coincidence.

This is not to suggest that a charitable organization could never recover damages for lost contributions to a limited-duration capital fundraising campaign. Samaritan Inns could have demonstrated permanent losses by presenting evidence that particular contributors who might otherwise have made contributions in 1994 and 1995 were unwilling to do so in the wake of the Tabitha's House controversy, and that Samaritan Inns was unable to secure contributions from alternative sources. It did not present any evidence to this effect, although Erickson did testify that he felt the members of the Tabitha's House fundraising board would be reluctant to be involved in the Next Steps Initiative.[11] The best evidence of the reactions of potential contributors to the Tabitha's House controversy came from the interviews conducted by the panel of fundraising experts. The comments that Gelatt, a member of the expert panel, cited in his written declaration did reflect some hesitation on the part of contributors to give money to Samaritan Inns until it resolved its problems with the District, but none of the cited comments suggest that any contributor viewed these problems as an absolute barrier to future contributions. Furthermore, Gelatt testified that although the expert panel members thought that the District's actions had some impact on Samaritan Inn's fundraising capability, they were unable to quantify it or to

state with any certainty whether the impact would be manifested as an outright loss or merely as a delay. Given the dearth of evidence and the conflicting methodologies used by Erickson and Edelman, we conclude that Samaritan Inns did not prove with reasonable certainty that it had lost any capital contributions. Consequently, the district court's finding that Samaritan Inns lost $1,958,501 in 1994 and 1995 was clearly erroneous.

■ The district court's award of damages for the delayed receipt of the Next Steps Initiative funds is a different matter. Through the testimony of Erickson and Derrick, Samaritan Inns presented substantial evidence to support the district court's finding that the District's actions forced a delay in the commencement of the Next Steps Initiative. Having demonstrated the fact of a delay with reasonable certainty, Samaritan Inns was only required to prove the extent of its damages "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250. While neither Erickson nor the district court could know with certainty whether Samaritan Inns ultimately would meet the goals of the Next Steps Initiative, Gelatt testified that those goals were reasonable and attainable. Given this expert testimony, the district court could reasonably rely on Erickson's estimates of the amount Samaritan expected to raise through the Next Steps Initiative as more than "mere speculation and conjecture." *Id.; cf. Wood,* 859 F.2d at 1493.

■ Samaritan Inns is, however, only entitled to recover damages for delays caused by the District, not for delays caused by factors over which the District had no control, such as community opposition to Tabitha's House. The district court concluded that as a result of the District's actions, Samaritan Inns was unable to raise any capital contributions from October 1993, when the stop-work order was issued, to the time of trial in February 1995, and that the "earliest prudent commencement date for the

---

11. Even if Erickson could not ascertain the intentions of all of its hoped-for donors to the capital campaign, the record demonstrates he

had ongoing relationships with some of Samaritan Inns' key donors and could at least have determined their views.

Next Steps Initiative [was] 1996." Therefore, it awarded Samaritan Inns damages for a delay of two years. The district court's finding that the District's actions forced a two-year delay in the receipt of funds by Samaritan Inns is clearly erroneous. At the very latest, the District had ceased to oppose Samaritan Inns' activities by July 12, 1994, when it issued a certificate of occupancy for Tabitha's House. As early as March 15, 1994, the District had entered into a consent agreement not to revoke the Tabitha's House permits or attempt to stop work on the project without a legitimate reason. Although Cross caused a citation to be issued against Lazarus House after the consent order was issued, that matter was quickly resolved. After the issuance of the certificate of occupancy for Tabitha's House, Samaritan Inns' fundraising efforts were still presumably hindered by significant obstacles unrelated to the District, including most notably, the appeal to the BZA in August 1994 by community residents seeking to revoke Tabitha House's certificate of occupancy. But the District cannot be held responsible for that delay.[12] Furthermore, Samaritan Inns is entitled to recover only for the delay that could not reasonably have been minimized had Samaritan Inns begun its capital campaign once the consent decree was entered.

Under these circumstances, the maximum period of delay reasonably attributable to the District's actions is nine months, from the time the stop-work order was issued in October 1993 to the time the certificate of occupancy was issued in July 1994. The minimum period of delay is three months, from the issuance until the revocation of the stop-work order. Therefore, we remand the case to the district court for redetermination of the period of delay reasonably attributable to the District, and recalculation of the amount of Samaritan Inns' damages.[13] On remand, because Samaritan Inns did not demonstrate any "lost" contributions, the entire sum of $8 million that it expected to receive from 1994 to 1997 must be classified as "delayed."[14]

### III.

The remaining issues do not require extensive discussion. First, the District contends that Cross and Montgomery were entitled to qualified immunity because they could reasonably have believed that their actions were lawful. Additionally, it contends that the district court abused its discretion in awarding punitive damages against Cross and Montgomery for their "reckless and callous indifference" to Samaritan Inns' rights under the Fair Housing Act. The District focuses on a 1992 decision by the BZA ruling that a building that provided former prison inmates with housing, as well as religious guidance and assistance with financial matters, had to be classified under the zoning laws as a community-based residential facility, rather than as a rooming or boarding house. The District maintains that, based on this precedent, Cross and Montgomery could reasonably have believed that Tabitha's House was a community-based residential facility.

Government officials who violate a plaintiff's civil rights are entitled to qualified immunity if the officials reasonably could have believed that their actions were lawful in light of clearly established federal law and the information available to them at the time

12. Erickson also testified that the Ward 4 Council Member had introduced legislation in the Council of the District of Columbia in 1994 that would have made Tabitha's House a community-based residential facility. The measure was never enacted, and the District cannot be held responsible for the delay caused by the actions of an individual legislator.

13. Because a remand is required, we note that Edelman appears to have relied on the Consumer Price Index, a measure of inflation, rather than any measurement of interest rates, in making his damages calculations. While we do not now decide whether any particular method of calculating the income lost as a result of the delay is preferable to another, the district court should consider on remand whether Edelman's methodology is a reliable and appropriate way to measure Samaritan Inns' damages, and regardless of what methodology is used, the court should explain the basis for its choice. *See generally St. Louis Southwestern Ry. Co. v. Dickerson,* 470 U.S. 409, 412, 105 S.Ct. 1347, 1348–49, 84 L.Ed.2d 303 (1985); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 536–42, 103 S.Ct. 2541, 2550–53, 76 L.Ed.2d 768 (1983).

14. Erickson's analysis indicated that he anticipated that Samaritan Inns would receive $2,996,667 in 1994, $3,110,667 in 1995, $1,697,167 in 1996, and $195,500 in 1997.

the actions took place. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). Punitive damages for violations of federal law are available where a defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1982). The district court found that Cross and Montgomery were not entitled to qualified immunity, and that punitive damages were appropriate, based on their entire course of conduct during the Tabitha's House controversy. For example, the district court found that the October 1993 stop-work order was facially invalid because it contained no explanation of why it had been issued. Although the Zoning Administrator recommended that the order be vacated, Cross refused to do so, claiming that the Mayor had decided to support the protesters. As a result, the stop-work order remained in effect until mid-January 1994. Cross also directed Montgomery to revoke the building and demolition permits for Tabitha's House. Montgomery then wrote a letter purporting to revoke the permits without the hearing required under District law. Even if Cross and Montgomery could reasonably have believed that Tabitha's House was a community-based residential facility by reason of the BZA's 1992 decision, there is nothing in the record to suggest that they could have reasonably believed that these actions were lawful. To the contrary, the district court found that these actions were motivated by intentional discrimination against the prospective residents of Tabitha's House on the basis of their handicaps. Given the course-of-conduct evidence, the district court's findings that Cross and Montgomery were not entitled to qualified immunity and that they acted with reckless and callous disregard for Samaritan Inns' rights are not clearly erroneous. Hence, the district court did not abuse its discretion in awarding punitive damages.

Second, the District contends that if it prevails in this court as to the compensatory damages award for "lost" and "delayed" contributions to the Next Steps Initiative, the case should also be remanded for reconsideration of the award of attorney's fees and costs. We agree. Samaritan Inns confined its response to this contention by asserting, in a footnote to its brief, that there was nothing in the record to indicate that the fee award was related to the lost contributions award. As a prevailing plaintiff, Samaritan Inns is entitled to recover reasonable attorney's fees and costs because the District has not demonstrated any circumstances that would make such an award unjust. 42 U.S.C. § 3613(c)(2); *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). The reasonableness of the award, however, may turn on the degree of success that a plaintiff achieves. *Id.* at 434–36, 103 S.Ct. at 1939–41. On remand, therefore, the district court shall reconsider the award, determining whether to reduce it in light of the revised level of success that Samaritan Inns ultimately achieves.

Finally, Samaritan Inns cross-appeals the district court's denial of its "reasonable accommodation" claim under 42 U.S.C. § 3604(f)(3)(B). This claim stems from a letter of December 1, 1993, that counsel for Samaritan Inns wrote to Cross. The letter requested that the District agree that the social services that Samaritan Inns planned to provide at Tabitha's House were permitted as a matter of right, and agree to issue a certificate of occupancy for Tabitha's House as a boarding, rooming, or apartment house once construction was completed. In the complaint, Samaritan Inns alleged that the District violated § 3604(f)(3)(B) by failing to agree to these proposals. The district court addressed this issue in cursory fashion, noting only that "Samaritan Inns has failed to present persuasive evidence in support of this claim."

■ The District properly points out that we need not address Samaritan Inns' "reasonable accommodation" contentions because they are moot. The District has issued a certificate of occupancy for Tabitha's House as a rooming and boarding house. Thus, the District has made it clear that the services Samaritan Inns intends to provide at Tabitha's House are permitted as of right, and that they do not, in the District's view, make it a community-based residential facility. That conclusion is supported by the adminis-

trative law judge's decision of December 28, 1993, finding that Tabitha's House was properly classified as a rooming or boarding house rather than as a community facility, and by the BZA's decision not to revoke Tabitha's House's certificate of occupancy. Hence, there is no formal District policy or rule preventing Samaritan Inns from making its planned use of Tabitha's House, and it is unclear what "accommodation" Samaritan Inns requests. The district court thus properly denied the request for relief.

Accordingly, we reverse the judgment in part and remand the case for recalculation of Samaritan Inns' damages for delayed capital contributions arising from the District's interference with the Next Steps Initiative, and for reconsideration of the award for attorney's fees and costs; otherwise we affirm.