OPINION OF THE COURT
F. Dana Winslow, J.
Defendants’ motion pursuant to CPLR 3211 for an order dismissing the complaint is granted in part and denied in part as determined hereafter.
In this action for declaratory and injunctive relief against the Chairman and members of the Board of Assessors of Nassau County and Nassau County, the plaintiffs, who are homeowners, contend that the County maintains a racially discriminatory residential assessment system that impacts minority homeowners in Nassau County.
Three causes of action are alleged: the first two address violations of Federal law, the third is predicated upon a violation of the Nassau County Government Law (otherwise known as the Nassau County Charter). The first cause of action alleges violations of title VI of the Civil Rights Act of 1964 (42 USC § 2000d) and its implementing regulations affecting housing (24 CFR 1.4). The second cause of action alleges violations of title VIII of the Civil Rights Act of 1968 (42 USC § 3601 et seq. [Fair Housing Act]). The third cause of action alleges violations of section 603 of the Nassau County Government Law (L 1936, ch 879, as amended by L 1946, ch 708, § 1, eff July 1, 1946). Each cause of action is addressed seriatim.
Initially, the court notes that the defendants have a heavy burden to show that the complaint should be dismissed pursuant to CPLR 3211 (a) (7) for failure to state a cause of action. The allegations are accepted as true and consideration “is limited to ascertaining whether the pleading states any cause of action, and not whether there is evidentiary support for the complaint” (LoPinto v J. W. Mays, Inc., 170 AD2d 582, 583). *223 Consequently, the court will consider the claims as being true and the contentions in the light most favorable to the plaintiffs (LoPinto v J. W. Mays, Inc., supra).
TITLE VI
The first cause of action alleges violations of title VI of the Federal Civil Rights Act of 1964, which prohibits recipients of Federal financial assistance from discriminating on a racial basis.
42 USC § 2000d provides: “No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.”
The defendants contend that the County’s real property tax assessment system is not racially discriminatory in intent or effect, but rather results in reasonably fair and equitable assessments. In support of this contention the defendants rely, inter alia, on prior case law (see, Matter of Board of Mgrs. v Board of Assessors, 197 AD2d 620; Matter of Chasalow v Board of Assessors, 202 AD2d 499). The court finds that neither of these cases is determinative. In Matter of Board of Mgrs. the Court held that the County system of assessment as applied to the petitioner’s property was not constitutionally infirm. In that case the petitioner’s property was reclassified from class I property to class II property and was reassessed based upon this new classification at a higher burden. The Court concluded, based upon the record presented, that insofar as the cost method of assessment was applied in a consistent manner with respect to all class I property in Nassau County, that similarly situated taxpayers were treated uniformly and the reassessment of the petitioner’s property did not result in disparate tax treatment of a constitutional dimension. In the case at bar no constitutional infirmities are alleged, nor were title VI claims asserted in Matter of Board of Mgrs.
Matter of Chasalow (supra) is similarly inapplicable to the case at bar. In that proceeding, brought pursuant to CPLR article 78, the appellate court reversed the trial court’s finding that the method of assessment employed by the Board of Assessors of Nassau County was illegal and unconstitutional. Although the method of assessment remains the same, the challenge presented in the instant action is not predicated upon constitutional violations and accordingly, of necessity, must be evaluated by different standards rendering the determination in Matter of Chasalow distinguishable.
*224 The defendants raise two points regarding the plaintiffs’ title VI claims. The first is that title VI does not apply to the County’s real property tax assessment system because the complaint does not allege that the system is a Federally assisted program. In support of this position the defendants rely on Grove City Coll, v Bell (465 US 555 [1984]), Hodges v Public Bldg. Commn. (864 F Supp 1493 [ND Ill 1994]), and Schroeder v City of Chicago (927 F2d 957 [7th Cir 1991]). Following the Grove City Coll, v Bell case (supra), the Civil Rights Restoration Act of 1987 (Pub L 100-259, 102 US Stat 28 [CRRA]) was enacted which broadened the definition of “program or activity” defined in title VI (see, 42 USC § 2000d-4a), which, as relevant here, provides as follows:
“For the purposes of this subchapter, the term ‘program or activity’ and the term ‘program’ mean all of the operations of—
“(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
“(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government”.
In Hodges {supra), a suit considering the proposed expansion of a Chicago high school, the plaintiffs contended that the defendants, including the City of Chicago, blocked the expansion based on intentional racial discrimination. The Hodges court, although recognizing the expansion of Grove City’s {supra) narrow reading of title VI by the CRRA, rejected the plaintiffs’ trickle-down theory of Federal financial assistance, holding that the City was “not an ‘operation’ of ‘a department, agency, special purpose district, or other instrumentality of a State or of a local government,’ or of ‘the entity of such State or local government that distributes such assistance’ ” (Hodges v Public Bldg. Commn., supra, at 1505). That court concluded that the City is a municipality and, as such, did not fit within the definition of “program or activity” for purposes of title VI. As noted by the court in Hodges (supra), Schroeder v City of Chicago (supra) also held that the City of Chicago did not fit the statutory definition of “program or activity” and was not a department or instrumentality of a local government, but rather, as a full-blown municipality, was an entire local government (Hodges v Public Bldg. Commn., supra, at 1506).
In contrast, the Second Circuit in Innovative Health Sys. v City of White Plains (117 F3d 37 [2d Cir 1997]) has concluded *225 that a broad interpretation of the terms “program or activity” made the discrimination claims asserted pursuant to title II of the Americans with Disabilities Act of 1990 (42 USC § 12131 et seq. [ADA]) and the Rehabilitation Act of 1973 (29 USC § 794 [a]) applicable to the City defendant. In that case the court noted that both title II of the ADA and section 504 of the Rehabilitation Act (Pub L 93-112, 87 US Stat 355) prohibit discrimination by a public entity based on a disability. The ADA provides “[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity” (42 USC § 12132). The Rehabilitation Act is similarly worded: “No otherwise qualified individual with a disability * * * shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance” (29 USC § 794 [a]).
The Rehabilitation Act defines “program or activity” as “all of the operations” of specific entities, including “a department, agency, special purpose district, or other instrumentality of a State or of a local government” (29 USC § 794 [b] [1] [A]). The court determined that the plain meaning of “activity” is a “ ‘natural or normal function or operation’ ” and that both the ADA and the Rehabilitation Act clearly encompass zoning decisions by the City (Innovative Health Sys. v City of White Plains, supra, at 44). The court further noted that the language of title II’s anti-discrimination provisions does not limit the ADA’s coverage to conduct that occurs in the “ ‘programs, services, or activities’ ” of the City, but rather is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context (supra, at 45).
Innovative Health Sys. (supra) is both applicable and instructive in the instant matter. Most significantly, title VI employs the same phraseology as does the Rehabilitation Act and a “program or activity” applicable under that statute provides persuasive insight into the application of the identical phrase in the instant matter. Nor is it uncommon for courts in considering claims under analogous title VI regulations to look to title VII (Federal Civil Rights Act of 1964) disparate impact cases for guidance (see, e.g., New York Urban League v State of New York, 71 F3d 1031; Elston v Talladega County Bd. of Educ., 997 F2d 1394, 1407, n 14 [11th Cir 1993]; Georgia State Conference of Branches of NAACP v State of Georgia, 775 F2d *226 1403, 1417 [11th Cir 1985]; Larry P. v Riles, 793 F2d 969, 982, nn 9, 10 [9th Cir 1984]).
As noted by the plaintiffs, the court in Association of Mexican-Am. Educators v State of California (836 F Supp 1534, 1541) held that title VI itself permits a claim against the State. In support of this position is a line of cases in which a State was a title VI defendant “even though it was not a ‘program or activity ” (supra, at 1541; see, United States v Yonkers Bd. of Educ., 893 F2d 498, 500 [2d Cir 1990]; Georgia State Conference of Branches of NAACP v State of Georgia, 775 F2d 1403, 1407 [11th Cir 1985], supra; Queets Band of Indians v State of Washington, 765 F2d 1399, 1404, n 2 [9th Cir 1985], vacated as moot 783 F2d 154 [9th Cir 1986]; United States v School Dist., 577 F2d 1339, 1350, n 18 [6th Cir 1978]; Knight v State of Alabama, 787 F Supp 1030, 1361-1365 [ND Ala 1991]; United States v State of Louisiana, 692 F Supp 642, 650-653 [ED La 1988]). The court in Association of Mexican-Am. Educators v State of California {supra, at 1543) also interprets 42 USC § 2000d-4a and concludes that where “ ‘any * * * ‘part of [an] entity’s operations ‘is extended Federal financial assistance’ ” all of that entitys operations are “programs or activities” and are subject to title VI.
In addition to a State being a proper defendant under title VI, there is a line of cases which have held that cities (see, Johnson v City of Saline, 151 F3d 564 [6th Cir 1998]; Trovato v City of Manchester, 992 F Supp 493 [D NH 1997]) and districts (see, San Diego Unified Port Dist. v Gallagher, 62 Cal App 4th 501, 73 Cal Rptr 2d 30; Bledsoe v Palm Beach County Soil & Water Conservation Dist., 133 F3d 816 [11th Cir 1998]) are also covered entities under the ADA and title II, both statutes pertaining to “services, programs, or activities” of a public entity.
Accordingly, after review of numerous cases interpreting the applicability of title VI, title II, the ADA, the Restoration Act and the Rehabilitation Act, from the Second and other Circuits, the court concludes that Nassau County is a proper defendant in this title VI action and that the Board of Assessors and the real property assessment program administered by them are subject to this statute and its implementing regulations (see also, New York Urban League v Metropolitan Transp. Auth., 905 F Supp 1266, 1273 [SD NY 1995], vacated and remanded sub nom. New York Urban League v State of New York, 71 F3d 1031 [2d Cir 1995] [the “plain language of 42 U.S.C. § 2000d-7(a)(l) is reinforced by the fact that Congress *227 amended Title VI to make clear that the statute authorizes suit against an entire system for the discriminatory practices of a discrete program within that system receiving federal funds”], citing United States v City of Yonkers, 880 F Supp 212, 232 [SD NY 1995]).
The defendants next contend that title VI requires proof of intentional discrimination. In Guardians Assn. v Civil Serv. Commn. (463 US 582), the Supreme Court held that section 601 of title VI (Pub L 88-352, 78 US Stat 241) prohibited only intentional discrimination, not actions that have a disparate impact upon minorities (see, supra, at 610-611, concurring opn of Powell, J., in which Burger, Ch. J., and Rehnquist, J., joined; supra, at 612, concurring opn of O’Connor, J.; supra, at 641-642, dissenting opn of Stevens, J., in which Brennan and Black-mun, JJ., joined; see also, New York Urban League v State of New York, 71 F3d 1031 [2d Cir 1995], supra). The Court also concluded that title VI delegated the authority to promulgate regulations incorporating a disparate impact standard to Federal agencies (see, Guardians Assn. v Civil Serv. Commn., supra, at 584, opn of White, J.; supra, at 623, n 15, dissenting opn of Marshall, J.; supra, at 643, dissenting opn of Stevens, J., in which Brennan and Blackmun, JJ., joined; see also, Alexander v Choate, 469 US 287, 293; New York Urban League v State of New York, 71 F3d 1031). Additionally, at least 24 Federal agencies have reached this same conclusion (see, Alexander v Choate, 469 US 287, 297, n 17). In this regard, the United States Department of Transportation has promulgated regulations pursuant to title VI which prohibit actions with a disparate impact upon the protected class, as follows (49 CFR 21.5 [b] [2]): “A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program * * * may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color or national origin”.
In nearly identical fashion the Department of Housing and Urban Development has promulgated regulations prohibiting actions with disparate impacts, as follows (24 CFR 1.4 [b]):
“(1) A recipient under any program or activity to which this Part 1 applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin * * *
“(ii) Provide any housing, accommodations, facilities, services, financial aid, or other benefits to a person which are dif *228 ferent, or are provided in a different manner, from those provided to others under the program or activity * * *
“(2)(i) A recipient, in determining the types of housing, accommodations, facilities, services, financial aid, or other benefits which will be provided under any such program or activity, or the class of persons to whom, or the situations in which, such housing, accommodations, facilities, services, financial aid, or other benefits will be provided under any such program or activity, or the class of persons to be afforded an opportunity to participate in any such program or activity, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect to persons of a particular race, color, or national origin.”
An examination of the cases which have addressed these and similar regulations establishes, as contended by the plaintiffs, that a prima facie showing of a disparate impact is sufficient to defeat a motion to dismiss. Once such a showing has been made then the burden shifts to the defendant to demonstrate the existence of a “substantial legitimate justification” for the alleged discriminatory practice (see, Georgia State Conference of Branches of NAACP v State of Georgia, 775 F2d, supra, at 1417).
The plaintiffs’ first cause of action seeks to have the court apply this lower disparate impact standard in evaluating the County’s alleged discriminatory practices relating to real property assessment. However, and as is readily conceded, no Federal agency administers any program of aid or financial assistance in support of real property assessment in the County. Nor has any Federal agency promulgated any regulations relating to this function or that is otherwise connected to Nassau County government’s real property assessment programs or policies. While the court recognizes that title VI applies to all functions carried out by the County or any of its departments or agencies, plaintiffs would have the court reach one step further and apply a disparate impact analysis to the effects of the County’s real property assessment program.
The court’s concern about the seeming inequity fostered by the County’s reliance on 1938 data in the administration of its real property assessment functions cannot override the title VI requirements. Despite the claimed discrimination by the *229 County’s continued use of this database and methodology, the plaintiffs have not identified nor could the court find any regulations promulgated under any Federal program or activity applicable to the County’s real property assessment system which would warrant the application of the lower standard. Though the plaintiffs seek to utilize the disparate impact analysis of the County’s real property assessment program, the simple truth is that the County’s real property assessment program is not a recipient under any program or activity to which Federal financial assistance is provided.
The landscape evidenced by the Supreme Court’s analysis in Guardians Assn. (supra) makes clear that an action predicated upon the title VI statutory scheme requires an evidentiary showing of intent. This element is absent from the plaintiffs’ title VI claim. Following the plaintiffs’ argument, that a showing of disparate impact is sufficient under the instant circumstances, to its logical conclusion leads to an untenable result. If the court were to apply a disparate impact analysis in analyzing the County’s real property assessment system based on regulations promulgated, for example, by the Department of Housing and Urban Development to promote the fair and equitable administration of housing development programs, inter alia, under what conditions and when would a court analyze alleged discrimination based upon the higher standard enunciated by the Supreme Court and inherent in the title VI statutory scheme? Stated another way, if the regulations promulgated by Federal agencies for the administration of unrelated programs, such as urban development or police protection, were applied to cover real property tax assessment activities, the lower standard then applicable would eclipse the necessary showing of intentional discrimination supported both by a fair reading of the statute and by the United States Supreme Court determinations. There must be some connection between the regulation sought to be utilized and the activity alleged to be prohibited in order for the plaintiffs to gain the benefit of the lower disparate impact standard.
The plaintiffs fail to address the issue of whether the regulations promulgated under one program of benefits is or can be applicable to a party which does not participate or is not involved in such program or activity. Such regulations reduce the evidentiary burden on a plaintiff and allow a showing of disparate impact to be sufficient in establishing a prima facie case but do not obviate the necessity to establish that the specific regulation allegedly violated bears some connection to *230 the plaintiff. All of the cases examined, which were brought pursuant to various regulations promulgated under the discrimination statutes (supra), arise out of claims of discrimination under a program or activity to which the specific regulation applies (see, e.g., Chester Residents Concerned for Quality Living v Seif, 132 F3d 925 [3d Cir 1997] [action against Pennsylvania Department of Environmental Protection concerning operation of a waste processing facility]; New York Urban League v State of New York, 71 F3d 1031 [2d Cir 1995], supra [action challenging allocation of funds for mass transit under Department of Transportation regulations]; Scelsa v City Univ., 806 F Supp 1126 [SD NY 1992] [in an employment discrimination action plaintiff must be the intended beneficiary of a Federal spending program]; 3004 Albany Crescent Tenants’ Assn. v City of New York, 1997 WL 225825, 1997 US Dist LEXIS 6138 [SD NY, May 5, 1997, McKenna, J.] [to satisfy disparate impact claim plaintiffs must show the discriminatory effect of defendant New York City Department of Housing Preservation and Development policies]; Campaign for Fiscal Equity v State of New York, 86 NY2d 307 [action concerning State distribution of Federal funds for education relying on regulations promulgated by the Department of Education]).
The court’s conclusion in this regard is further supported by an examination of the House of Representatives Report No. 88-914, prepared by the Judiciary Committee for House of Representatives Bill HR 7152, which, as noted by the defendants, became title VI of the Civil Rights Act of 1964:
“The Committee on the Judiciary, to whom was referred the bill (H.R. 7152) to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations * * * to prevent discrimination in federally assisted programs * * * report favorably thereon with amendments and recommend that the bill do pass.
“purpose and content of the legislation
“The bill, as amended, is designed primarily to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States. In furtherance of these objectives the bill * * * (6) prohibits discrimination in any Federal financial assistance program”. (HR Rep No. 914, 88th Cong, 2d Sess, reprihted in 1964 US Code Cong & Admin News 2391.)
On its face the legislation was not intended to cover all discrimination, but rather that discrimination in any Federal *231 financial assistance program. The County’s assessment function is one of collection rather than distribution of funds and services. Since the Board of Assessment is not the recipient of title VI funds, no title VI regulation is available to the plaintiffs. Thus, Nassau County’s real property tax assessment program is not part of any Federal financial assistance program, and the court is constrained but compelled to dismiss the first cause of action predicated upon alleged violations of title VI, not because the court believes that the current system is equitable, but rather because the narrow issue of intent cannot be sustained.
Defendants’ motion to dismiss plaintiffs’ claims pursuant to title VI is granted.
PRIOR NOTICE
The court notes, though not alleged, that the County may be on notice that its current practice of assessment has or may have a disparate impact on minority communities. Notice was first provided in 1964 in C. H. O. B. Assocs. v Board of Assessors (45 Misc 2d 184, 197 [Sup Ct, Nassau County], affd 22 AD2d 1015) which provided “the court does not intend to suggest and does not find that there is no need for a complete review of all of the assessments in this county, or that it might not be a good thing to do”. The court held that the failure of the County Board of Assessors to maintain uniformity in the ratio of assessments of all land, vacant and improved, to market value did not invalidate the assessment roll where equality of assessment could actually be achieved by the method employed. A great deal has occurred since 1964 when the C. H. O. B. Assocs. case was decided, particularly with respect to the uneven real property appreciation experienced by different communities within this county, but no revaluation was ordered in the ensuing 35 years.
Another case which highlighted the inevitability of Countywide reassessment is Matter of Krugman v Board of Assessors (141 AD2d 175). In Matter of Krugman, the trial court denied a motion for summary judgment and on appeal the Appellate Division reversed, finding that the defendant’s method of assessment whereby properties were reassessed after a sale or transfer, a so-called “Welcome Neighbor” reassessment, was illegal and violated both the State and Federal constitutional and statutory requirements of uniformity and equality {supra, at 182; see also, RPTL 305 [2]). The Court further held that “[i]n order to achieve uniformity and ensure that each property *232 owner is paying an equitable share of the total tax burden the assessors, at a minimum, were required to review all property on the tax rolls in order to assess the properties at a uniform percentage of their market value” {supra, at 183). The court has difficulty distinguishing the illegal reassessment found in Matter of Krugman {supra) and that practiced by Nassau County today by the maintenance of selective reassessment initiated by taxpayers pursuant to RPTL article 7 proceedings. In effect, by reassessing property after such challenges based on comparable recent sales in the neighborhood of the challenged properties, the County is nonetheless engaging in selective reassessment. This conclusion is bolstered by the explosive success in tax certiorari proceedings in recent years, and the reported commensurate substantial costs to the County. It is irrelevant that the tax certiorari proceedings are initiated by taxpayers. The County is engaging in selective reassessment which results in a claim of discrimination between owners of similarly situated properties. The initiation of a claim to invoke a right is clearly not the same as offering that right as a matter of course.
The recognition that the defendants are on notice that the current assessment methodology may have a disparate impact is further evident from this court’s decision in Matter of Chasalow v Board of Assessors (May 23, 1989, McGinity, J.) and in the related decisions flowing therefrom (decision dated Dec. 16, 1992; 176 AD2d 800; 202 AD2d 499, supra, Iv denied 83 NY2d 759). In the end, the appellate court reversed the trial court’s determination that the County’s current method of assessment was illegal. The petitioner’s evidence did not meet the rigorous requirements needed to establish a constitutional infirmity under the Equal Protection Clauses of either the Federal or State Constitution, but rather only established “a moderate statistical deviation from a hypothetical norm” {Matter of Chasalow v Board of Assessors, 202 AD2d, at 501). This court notes that the challenge in the matter sub judice is (1) to titles VI and VIII and Nassau County Charter § 603, and (2) that nearly 10 years have elapsed since the commencement of Matter of Chasalow, which resulted in the finding of a “moderate statistical deviation”. Contrary to the defendants’ contentions, Matter of Chasalow is not controlling here. Of note is the closing comment in Matter of Chasalow (202 AD2d, at 502) in which the Court concluded: “It appears that the treatment by the Board of Assessors of reductions in assessed value achieved by means of judicial review might conceivably be viewed as creating a disparate form of assessment.”
*233 The court further notes that insofar as the County is now on notice of the likely disparate impact of its assessment practices, what in the past may have been viewed as “unintentional” discrimination may now be fairly considered intentional. The County’s continued failure to act in reliance on “unintentional” discriminatory results can no longer act as a shield for the County’s practices.
TITLE VIII
Plaintiffs’ second cause of action alleges violation of title VIII, the Fair Housing Act (42 USC § 3601 et seq.), which prohibits racial discrimination in the sale, rental or purchase of housing.
42 USC § 3604 (a) and (b) provide:
“Discrimination in the sale or rental of housing and other prohibited practices
“As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—
“(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
“(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.”
The seminal question presented by the plaintiffs’ title VIII claims is whether the statute can reasonably be interpreted to apply to the instant facts. The court could not find and the parties did not present any decision which is four square on point with the instant claims, and the plain meaning of the statute provides little assistance in determining the viability of the plaintiffs’ title VIII claims. Defendants contend that the statute cannot apply as the plaintiffs already own their homes. Defendants further contend that violations of the Fair Housing Act require a showing of intent to discriminate by the plaintiffs, a showing they maintain the plaintiffs cannot make.
As an initial consideration the court notes that the language of the Fair Housing Act, like all the anti-discrimination statutes, is “ ‘broad and inclusive’ ” and is subject to “ ‘generous construction’ ” (see, Metropolitan Hous. Dev. Corp. v Village of *234 Arlington Hgts., 616 F2d 1006, 1011 [7th Cir 1979]; Trafficante v Metropolitan Life Ins. Co., 409 US 205, 209 [1972]). “Generally, and particularly in a fair housing situation, the existence of a federal statutory right implies the existence of all measures necessary and appropriate to protect federal rights and implement federal policies” (see, Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts., 616 F2d, at 1011; see also, Sullivan v Little Hunting Park, 396 US 229, 239 [1969]). Additionally, as both the courts in Stackhouse v DeSitter (620 F Supp 208 [ND Ill 1985]) and United States v Gilbert (813 F2d 1523 [9th Cir 1987]) noted, the Fair Housing Act’s prohibitions “against ‘ “otherwise mak[ing] unavailable or denying] a dwelling” * * * appear [] to be as broad a prohibition as Congress could have made, and all practices which have the effect of making dwellings unavailable on the basis of race are therefore unlawful’ ” (United States v Gilbert, supra, at 1528; Stackhouse v DeSitter, supra, at 211, n 6 [quoting 42 USC § 3604 (a)]).
The court in Metropolitan Hous. Dev. Corp. (supra, at 1011) continued: “[t]he courts of appeals, recognizing these policies, regularly have provided relief from exclusionary zoning (or its equivalent by refusal to permit tying into city’s water and sewer systems through denial of annexation or issuance of permit) under the Fair Housing Act” (see, Kennedy Park Homes Assn. v City of Lackawanna, 436 F2d 108 [2d Cir 1970], cert denied 401 US 1010; United Farmworkers v City of Delray Beach, 493 F2d 799 [5th Cir 1974]). In fact, the broadness of the language of the FHA and the rigor to which its prohibitions are applied is well illustrated by the relief normally granted both by Federal courts and State courts in exclusionary zoning cases, “what has become known as ‘site-specific relief,’ that is, the opening up of a particular parcel to low- or moderate-income multiple housing on a case-by-case basis” (Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts., supra, at 1011). “Such relief ordinarily runs counter to local zoning or other local legislation, but given the national open housing policy established by Congress, acting under the Civil War Amendments, the state or local legislation must yield to the paramount national policy. The Supreme Court has left no doubt as to the outcome of such a conflict between local and national interests” (supra).
The broadness of the national public policy under the FHA is further illustrated by the long line of cases requiring that local authorities make “reasonable accommodations” in rules, policies, practices and services in relation to persons with *235 handicaps (42 USC § 3604 [f] [3] [B]; Samaritan Inns v District of Columbia, 114 F3d 1227 [DC Cir 1997]; Hovsons, Inc. v Township of Brick, 89 F3d 1096 [3d Cir 1996]).
In addition to the FHA’s application in exclusionary zoning cases, the statute has been held to encompass mortgage redlining, insurance redlining, racial steering “and other actions by individuals or governmental units which directly affect the availability of housing to minorities” (see, Southend Neighborhood Improvement Assn. v County of St. Clair, 743 F2d 1207, 1209 [7th Cir 1984]; see also, Halet v Wend Inv. Co., 672 F2d 1305 [9th Cir 1982] [discriminatory rental decisions]; United States v City of Parma, 661 F2d 562 [6th Cir 1981], cert denied 456 US 926 [rejection of public and low-income housing and restrictive land use ordinances]; Marable v Walker & Assocs., 644 F2d 390 [5th Cir 1981] [unequal application of rental criteria]; United States v Mitchell, 580 F2d 789 [5th Cir 1978] [racial steering]).
The court finds of particular interest those cases where actions have been brought against property and casualty insurers challenging redlining as a form of racial discrimination in which insurers charged higher rates for people in certain areas (see, e.g., National Assn. for Advancement of Colored People v American Family Mut. Ins. Co., 978 F2d 287 [7th Cir 1992]). In National Assn. for Advancement of Colored People v American Family, the court held that the FHA was applicable to redlining. The plaintiffs made the connection to the FHA by alleging, inter alia, that as a mortgage loan was usually essential to home ownership, and as lenders were unwilling to provide credit without insurance, redlining practices regarding such insurance, particularly in regard to higher premiums, priced some would-be buyers out of the market.
National Assn. for Advancement of Colored People v American Family (supra) also addressed a jurisdictional issue raised by the defendants in the matter sub judice. Here the defendants contend that the plaintiffs are not aggrieved as they already own their homes and the County assessment practices obviously did not affect them, in effect, raising the issue of standing. The similar argument in the National Assn, for Advancement of Colored People case, that none of the plaintiffs had been unable to buy a house, was rejected, the court noting that 42 USC § 3602 (i) defines “aggrieved person” as:
“[A]ny person who * * *
“claims to have been injured by a discriminatory housing practice; or * * *
*236 “believes that such person will be injured by a discriminatory housing practice that is about to occur.”
The court further noted that the plaintiff National Association for Advancement of Colored People itself had standing, in addition to several of the plaintiffs. The National Association for Advancement of Colored People as an organization includes many African-American homeowners and prospective homeowners and as such has organizational standing under the FHA. In this regard the complaint alleges that the assessment system has an adverse discriminatory impact upon minority homeowners and inhibits their ability to own, buy, sell and rent dwellings and obtain mortgages. The plaintiffs further allege that this system of assessment has an impact on the community and that governmental services and benefits are thus distributed in a discriminatory manner. Based on the National Assn, for Advancement of Colored People holding, these allegations are sufficient to establish the instant plaintiffs’ standing as “aggrieved persons” under the FHA.
Further, “given the national open housing policy established by Congress, acting under the Civil War Amendments, the state or local legislation must yield to the paramount national policy” (Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts., 616 F2d, supra, at 1011). This court concludes that the FHA applies to the real property assessment policies, procedures and conditions practiced and imposed by the defendants herein. The court can discern no substantive distinction in the application of the broad national anti-discrimination policy, as embodied in the FHA, between zoning policies and real property assessment policies effecting the fair provision of housing.
The defendants also assert that no intent to discriminate can be shown by the plaintiffs and therefore the claims under the FHA must fail. Yet, a plaintiff, in stating a claim under the Fair Housing Act, need allege only discriminatory effect and need not show that the decision complained of was made with discriminatory intent (see, Civil Rights Act of 1968 [Pub L 90-284, 82 US Stat 73] § 801 et seq.; § 804 [a], [c], as amended 42 USÓ § 3601 et seq.; § 3605 [a], [c]; Soules v United States Dept. of Hous. & Urban Dev., 967 F2d 817, 822; Huntington Branch, Natl. Assn. for Advancement of Colored People v Town of Huntington, 844 F2d 926 [2d Cir 1988], affd in part 488 US 15; United States v Incorporated Vil. of Is. Park, 888 F Supp 419 [ED NY 1995]; Sassower v Field, 752 F Supp 1182 [SD NY 1990]).
*237 In deciding a CPLR 3211 (a) (7) motion the pleadings are afforded a liberal construction, the allegations are accepted as true and the plaintiff is accorded the benefit of every possible favorable inference in determining whether the facts as alleged fit within any cognizable legal theory. The court may not dismiss the complaint unless it appears beyond doubt that no set of facts in support of the allegations would entitle the plaintiffs to relief (see, Conley v Gibson, 355 US 41, 45-46 [1957]; LoPinto v J. W. Mays, Inc., 170 AD2d 582, supra; Corvetti v Town of Lake Pleasant, 227 AD2d 821). Accordingly, the defendants’ motion to dismiss plaintiffs’ title VIII claims is denied.
SECTION 603
Plaintiffs’ third cause of action alleges that the real property assessment system violates Nassau County Charter § 603 which requires an “equitable and scientific system of assessing property for taxation” (Nassau County Government Law § 603 [L 1936, ch 879, as amended by L 1946, ch 708, § 1, eff July 1, 1946]). The defendants rely on Matter of Chasalow v Board of Assessors (202 AD2d, supra, at 501) where the Court noted that “[i]t is well settled that in the area of real property taxation, rough equality, not complete uniformity, is all that is required”. The defendants further contend that the plaintiffs cannot challenge any perceived overassessment of their properties in this action as they have failed to exhaust their RPTL remedies.
Addressing the exhaustion argument first, in Matter of Krugman v Board of Assessors (141 AD2d, supra, at 179-180) the Court noted: “Generally, a taxpayer who challenges his property assessment is relegated to a tax certiorari proceeding brought under the provisions of RPTL article 7 for review of his assessment [citations omitted]. However, certain exceptions to the exclusive jurisdiction of RPTL article 7 exist. It is well recognized that where the jurisdiction of the taxing authority is challenged or the tax itself is claimed to be unconstitutional, one is not required to pursue a remedy under RPTL article 7 [citations omitted]. Furthermore, a taxpayer may properly forego the statutory certiorari procedure and mount a collateral attack on the taxing authority’s action if the challenge is to the method employed in the assessment involving several properties rather than the overvaluation or undervaluation of specific properties (Matter of Dudley v Kerwick, [52 NY2d 542]; Matter of 22 Park Place Coop. v Board of Assessors, [102 AD2d 893]).”
*238 In the matter sub judice the plaintiffs seek declaratory and injunctive relief and challenge the method of assessment employed by the County. This procedure is proper and the court finds the defendants’ contention in this regard meritless (see, Matter of Feldman v Assessor of Town of Bedford, 236 AD2d 399; Corvetti v Town of Lake Pleasant, 227 AD2d 821; Matter of Krugman v Board of Assessors, 141 AD2d 175, supra; Matter of 22 Park Place Coop. v Board of Assessors, 102 AD2d 893, supra; Hewlett Assocs. v City of New York, 57 NY2d 356).
As concerns the defendants’ motion on the merits, the case Matter of Board of Mgrs. v Board of Assessors (202 AD2d 417) is instructive. That case also involved a challenge to Nassau County Government Law § 603, and the appeal, which was decided the same month as Matter of Chasalow (supra) and by the same Bench, reversed the trial court which had (1) denied the appellant’s motion to dismiss the article 78 proceeding, and (2) after a nonjury trial, (a) declared illegal the assessment of one unit of the petitioners’ condominiums, (b) directed the appellants to adopt rules and regulations for assessment which comply with Nassau County Government Law § 603, and (c) directed the appellants to assess all of the petitioner’s condominium units with the new rules and regulations. The petition challenged the Board of Assessors’ assignment of a “A + 10%” grade to the respondent’s condominium units based upon published rules and regulations and the residence schedules specifications which divided residential building classifications into five grades: “AA”, “A”, “BB”, “B”, and “C”.
The appellate court found that the petition should have been dismissed on the appellant’s motion, holding as follows:
“Ordinarily, challenges to assessments on the grounds that they are illegal, irregular, excessive, or unequal, are to be made in a certiorari proceeding under RPTL article 7 [citations omitted], However, where the challenge is based upon the method employed in the assessment of several properties rather than the overvaluation or undervaluation of specific properties, a taxpayer may forego the statutory certiorari procedure and mount a collateral attack on the taxing authority’s action through either a declaratory judgment action or a proceeding pursuant to CPLR article 78 [citations omitted].
“In reviewing a taxpayer’s claim to determine whether this exception to the statutory procedure based upon the taxing authority’s methodology has been demonstrated, ‘ “[m]ere allegations, unsupported by evidentiary matter, that the attack is on the methods employed rather than individual evalúa *239 tions, are not enough to relieve plaintiffs of the obligation to pursue their relief via the provisions of Article 7 of the Real Property Tax Law” ’ (Matter of Krugman v Board of Assessors, supra, at 180, quoting Samuels v Town of Clarkson [91 AD2d 836, 837] [other citations omitted]). Where allegations seek a review of individual assessments, rather than the formula used, a proceeding pursuant to CPLR article 78 is improper * * *
“Further, the proof at the trial was improperly related to the propriety of the assessment and a review of the assessors’ mental processes, observations, and judgments [citation omitted]. The allegation regarding noncompliance with section 603 was never supported by evidentiary proof [citations omitted].
“The petitioner never specifically alleged that the appellants-respondents’ rules and regulations and specifications (1) failed to account for factors such as obsolescence, depreciation, and market value, (2) violated RPTL 305 (2), or (3) were facially invalid. As a result, the appellants-respondents were never provided with notice or an opportunity to be heard on these and other issues which were addressed by the Supreme Court, and never had the opportunity to make an appropriate record [citations omitted].” (Matter of Board of Mgrs. v Board of Assessors, supra, at 419-420.)
The Court therefore dismissed the petition. In the case at bar, the plaintiffs specifically allege that the County’s assessment methods failed to account for market values and have supported their claim concerning noncompliance with Nassau County Government Law § 603 by evidentiary proof, namely that the exemplar properties have a disproportionate assessment as a result of the County’s use of stale 1938 data.
Nassau County Government Law § 603 mandates scientific and equitable assessments. While RPTL 305 (1) provides that the “existing assessing methods in effect * * * on the effective date of this section may continue”, RPTL 305 (2) requires that all real property in each assessing unit be assessed at a uniform percentage of value. Read together, it is clear that while the County’s use of fractional assessment and cost methodology may continue, the County nonetheless has an obligation to provide uniformity in assessments.
The defendants’ reliance on the decision in Matter of Chasalow (supra) is misplaced. The data underlying the cause of action in that case dates from 1989 and before. The court finds that a reexamination of the effects of the County’s methodology is appropriate today.
*240 The alleged disparity between the market value and assessed value of property in different County locations and the need to utilize equalization rates which are 3.17% County-wide but vary with the community seriously argue against either a scientific or equitable system of assessment determination. Defendants’ use of the word adjustment in the context of attempting to realign disparate community property assessments established in 1938 and 1964 cannot be considered scientific when the underlying data may be so dated as to defy adjustment except on an individual basis. No assessment system can be equitable if, as plaintiffs allege, the community variations are substantial and the redress is confined to certiorari proceedings which (a) are voluntary, (b) must be commenced by individual taxpayers, (c) invite substantial delays in reimbursement for overpayment, and (d) necessarily require the payment of unreimbursed attorney’s fees and costs. The plaintiffs have made a sufficient showing to withstand the instant dismissal motion. Accordingly, the defendants’ motion to dismiss plaintiffs’ claims under the Nassau County Charter is denied.
The court notes that 34,000 residential small claims assessment review petitions were filed in 1998. If the plaintiffs’ allegations concerning disparate impact and nonuniform assessment are established at trial, the County will not be able to use RPTL 305 (1) or Matter of Chasalow (supra) as a shield to insist that it may continue its existing assessing method. Nassau County’s reliance on prior judicial determinations is misguided. Precedent is the starting point for rational analysis, not the end point for comfortable adherence to favorable decisions.